163 P.3d 179

Michael G. SHEEHAN, Sr.,
Plaintiff–Appellant,

v.

GROVE FARM COMPANY, INCORPO-
RATED, a Hawaii corporation; ALPS
Acquisition Sub, Inc.; Hugh W. Kle-
bahn; Donn A. Carswell; Pamela W.
Dohrman; Robert D. Mullins; William
D. Pratt; and Randolph G. Moore, De-
fendants–Appellees,

and

Allan Smith, Sandra Day, and Wilcox
Patterson, Defendants.

Nos. 25811, 26030.

Intermediate Court of Appeals of Hawai'i.

Aug. 30, 2005.

Reconsideration Denied Sept. 14, 2005.

Certiorari Granted Oct. 19, 2005.

Certiorari Dismissed as Improvidently
Granted July 31, 2007.

Richard E. Wilson, on the briefs, for Plaintiff–Appellant.

Corey Y.S. Park and Pamela W. Bunn (Paul Johnson Park & Niles), Honolulu, on the briefs, for Defendants–Appellees.

WATANABE, Acting C.J., FOLEY and FUJISE, JJ.

Opinion of the Court by FOLEY, J.

In this consolidated appeal, Plaintiff–Appellant Michael G. Sheehan, Sr. (Sheehan) appeals from the Final Judgment filed on April 8, 2003 (S.Ct. No. 25811), and the Judgment on Taxation and Assessment of Costs

filed on July 18, 2003 (S.Ct. No. 26030) in the Circuit Court of the Fifth Circuit (circuit court).[1]

In the Final Judgment, the circuit court entered judgment in favor of Defendants–Appellees Grove Farm Company, Incorporated (Grove Farm), for itself and as the successor in interest to ALPS Acquisition Sub, Inc.; Hugh W. Klebahn (Klebahn); Donn A. Carswell (Carswell); Pamela W. Dohrman (Dohrman); Robert D. Mullins (Mullins); William D. Pratt (Pratt); and Randolph G. Moore (Moore) (collectively, Appellees) and against Sheehan on Counts I through V of Sheehan's First Amended Complaint. Sheehan's claims against Defendants Allan A. Smith (Smith), Sandra L. Day (Day), and Wilcox Patterson (Patterson) had been previously dismissed without prejudice by stipulation filed September 30, 2002.

In the Judgment on Taxation and Assessment of Costs, the circuit court entered judgment in favor of Appellees and against Sheehan in the amount of $15,260.70.

Sheehan contends on appeal that the circuit court erred (1) by denying his Motion to Certify Class Action; (2) by granting Appellees' Motion to Dismiss First Amended Complaint or, In the Alternative, For Summary Judgment on Count V (Motion to Dismiss/SJ); (3) by denying his motion for reconsideration of the grant of the Motion to Dismiss/SJ; (4) by denying his Motion to Consolidate Cases; (5) by entering judgment in favor of Appellees; and (6) by granting Appellees' Motion for Taxation of Costs.

Sheehan's contentions are without merit. We affirm both judgments.

## I.

### A. History

In the 1990s, Grove Farm, a Hawai'i corporation with land holdings and operations on the Island of Kaua'i, encountered financial difficulties: it had accumulated a debt in excess of $62 million, the economy of Kaua'i was in recession, a shopping center owned by Grove Farm required repairs costing several million dollars, and home sales had stalled. By 1999, Grove Farm was operating at a loss, and Klebahn, the Chairman and Chief Executive Officer (CEO) of Grove Farm, advised the stockholders that Grove Farm required substantial amounts of cash in the near term and Grove Farm did not have the capital resources to meet those needs.

In December 1999, Grove Farm received a letter of intent from Scott Blum (Blum), Klebahn's son-in-law, to purchase all outstanding shares of Grove Farm stock for $125 per share. A Special Committee of outside and disinterested directors was appointed by the Board of Directors to review and respond to the proposal.[2]

One of the terms of Blum's letter of intent was that the letter be submitted for preliminary approval by the stockholders and that the holders of at least 75% of the shares vote for approval of the sale. On January 21, 2000, a special meeting of stockholders was held. The stockholders of only two-thirds of the outstanding shares voted in favor of proceeding with the offer. Because Blum did not receive approval from 75% of the stockholders, Blum's letter of intent terminated by its own terms. However, the stockholders of 88% of the shares showed a willingness to consider selling under the right circumstances.[3] Blum indicated he would consider resubmitting his proposal if an arrangement could be worked out to assure 75% stockholder approval. Since the stockholders had showed a willingness to sell, the Board of Directors retained the Special Committee to review and evaluate the strategic alternatives available to Grove Farm and to make recommendations to the Board.

---

1. The Honorable George M. Masuoka presided.

2. The Special Committee was comprised of Donn A. Carswell, Pamela W. Dohrman, Randolph G. Moore, Robert D. Mullins, Wilcox Patterson and William D. Pratt. Randolph G. Moore was elected the Chairman and spokesperson.

3. The breakdown of the shares was as follows: the stockholders of 66% of the shares voted in favor of the proposal; the stockholders of 12% voted against the proposal, but indicated their willingness to sell if they could receive land; and the stockholders of 10% voted against the proposal, but indicated they would sell if they thought they had the best price.

After presentations from three firms, the Special Committee hired Aspen Venture Group (Aspen) as a financial advisor for Grove Farm. Aspen advanced four alternatives: (1) orderly liquidation of Grove Farm, (2) restructuring of debt and a commitment to continued short-term development, (3) status quo, and (4) the sale of all or substantially all of the corporate assets to a single buyer or the sale of 100% of the Grove Farm stock. The Special Committee eventually determined the best option was to sell Grove Farm as a whole. Aspen determined the fair market value of Grove Farm's common stock to be in the range of $86 to $98 per share. The Special Committee authorized Moore to contact other parties that had previously expressed interest in Grove Farm.

On May 8, 2000, the stockholders' annual meeting was held. At the meeting, Guy St. Clair Combs was elected as a director, and Patterson withdrew his nomination for director and withdrew from the Special Committee. Moore reported on the Special Committee's activities. Aspen presented the results of its valuation study and its analysis of Grove Farm's alternatives to the stockholders. The Special Committee received input from several stockholders concerning the stockholders' concerns and suggestions.

After the annual meeting, the Special Committee reviewed a draft letter of intent from Blum. The Committee determined there were several major issues that needed resolution and directed counsel to discuss the issues with Blum's counsel.

On May 26, 2000, the Special Committee met to review Blum's draft merger agreement. The Committee again determined there were unresolved issues and directed counsel to discuss these issues with Blum's counsel. Moore reported that other parties had indicated an interest in submitting a proposal to purchase Grove Farm. One of the interested parties, Honu Group, Inc. (Honu), had sent a letter of interest dated May 23, 2000. The letter included terms of $130 per share, subject to due diligence, and an alternative of stockholders receiving land in lieu of cash for shares. Lehman Brothers had also sent a letter stating that it had entered into a joint venture with Honu to acquire Grove Farm.

The Special Committee decided to contact each party and to provide "due diligence" materials to the parties who signed a confidentiality agreement and provided evidence of financial ability. The Special Committee would advise the parties that they would have until July 10, 2000 to submit a proposal and that the Committee's intent was to negotiate a definitive agreement by July 24, 2000.

On June 5, 2000, Honu met with the Special Committee and reviewed with the Committee the terms of the May 23, 2000 letter. On July 19, 2000, Honu submitted a letter of intent with an offer of $136 per share, a program of offering land to stockholders, and, subject to a review of applicable securities law, offering stockholders the possibility to continue as stockholders post-merger.

The Committee also received proposals from other potential buyers and, after reviewing the proposals submitted, determined that Honu provided the best value to the stockholders. On July 20, 2000, the Board of Directors authorized Moore to accept Honu's letter of intent, subject to a few clarifications.

After the Special Committee received another proposal from one of the potential buyers, Honu submitted an August 1, 2000 addendum, in which Honu increased the purchase price to $140 per share and required Grove Farm to cease discussions with other parties for up to 45 days during negotiations with Honu. The Special Committee reviewed the revised proposals (of Honu and the other interested party) and recommended that the Board of Directors accept the Honu proposal. The Board of Directors reviewed the two proposals and authorized Moore to sign the Honu letter of intent, as modified by the addendum.

Honu, the Special Committee, and Grove Farm began negotiations on a definitive merger agreement and related disclosure schedules. In the midst of negotiations, Lehman Brothers sent a letter to Grove Farm indicating that, contrary to the earlier letter, it had not entered into a joint venture with Honu to buy Grove Farm. Thereafter, the Special Committee advised Honu that evi-

dence of its ability to perform would be required as well as certain other conditions and modifications to the merger agreement. Honu did not provide adequate evidence of its ability to finance the acquisition, and Honu and Grove Farm did not reach an agreement with respect to the terms of the merger agreement. Honu's letter of intent expired on its own terms.

The Special Committee consulted with counsel and decided Grove Farm should notify interested parties that the Honu negotiations had terminated. The Special Committee also determined that since Blum was no longer interested in acquiring Grove Farm, the Committee was no longer needed and was dissolved and the Board of Directors would handle any future sale proceedings.

Thereafter, the Board of Directors decided that a sale of Grove Farm was still the best option. However, timing was a key consideration because Grove Farm had substantial principal payments due at the end of the year and funding for various projects could not be deferred indefinitely. Pursuant to its decision to sell Grove Farm, the Board sent letters to previously and potentially interested parties.

On September 19, 2000, Daniel H. Case (Daniel Case) of Case Bigelow & Lombardi, Grove Farm's corporate counsel, indicated to Klebahn that his son, Stephen M. Case (Stephen Case), was interested in submitting a proposal. Daniel Case asked that Grove Farm waive any potential conflict of interest relative to his involvement as personal representative of Stephen Case and the continued representation of Grove Farm by Case Bigelow & Lombardi. Daniel Case stated that he would not be involved in Case Bigelow & Lombardi's representation of Grove Farm during the merger proceedings. At the September 22, 2000 meeting of the Board of Directors, Klebahn reported on his discussions with parties that had indicated interest in Grove Farm, including his discussions with Daniel Case. The Board agreed to waive any potential conflict of interest and authorized Klebahn to invite Stephen Case to submit a proposal.

Through ALPS Investment LLC (ALPS LLC), a company engaged in general investments and owned by Stephen M. Case Revocable Living Trust, Stephen Case confirmed his interest in submitting a proposal. ALPS LLC was managed by Ka Poʻe Hana LLC, of which the president was John Agee and the owners were Mr. and Mrs. Stephen Case. ALPS LLC subsequently entered into negotiations with Grove Farm on the terms of a definitive merger agreement and conducted due diligence.

On October 12, 2000, ALPS LLC executed a definitive Merger Agreement (Merger Agreement) and submitted it to Grove Farm's Board of Directors. The Board met on October 17, 2000 to review the terms of the Merger Agreement with counsel. The Board approved the Merger Agreement and decided to recommend that the stockholders approve it.

The Merger Agreement provided that ALPS Acquisition Sub, Inc.[4] (ALPS Acquisition) would merge with and into Grove Farm, with Grove Farm as the surviving corporation. Once the merger was complete, Grove Farm stockholders would be entitled to receive $152 per share. All shares of ALPS Acquisition held by ALPS LLC would be converted into new shares of Grove Farm. After the merger, ALPS LLC would own 100% of the shares of Grove Farm common stock.

On November 3, 2000, the Board of Directors sent out a proxy statement to the stockholders, informing the stockholders of the background and ALPS Acquisition offer and notifying the stockholders of a special meeting on December 1, 2000 to vote on the merger.

Grove Farm sent a letter to its stockholders on November 21, 2000, informing them that it had received two other non-binding proposals to purchase Grove Farm, but the only written, signed agreement was with ALPS Acquisition. Grove Farm stated that

---

4. ALPS Acquisition Sub, Inc. (ALPS Acquisition) was a Hawaiʻi corporation formed by ALPS Investment LLC for the purpose of merging with and into Grove Farm Company, Incorporated (Grove Farm).

Del Mar Pacific Group, LLC, had initially offered a higher price per share than ALPS Acquisition, but had withdrawn its offer upon learning of the provisions of the Merger Agreement. A second company, Wattson–Breevast, had submitted a letter of intent, and Grove Farm was in negotiations with Wattson–Breevast.

The records of Grove Farm indicate that at the time of the December 1, 2000 stockholders' special meeting there were 171,122 outstanding shares of Grove Farm stock held by 176 stockholders. At the meeting, Klebahn informed the stockholders that Wattson–Breevast had expressed interest in acquiring Grove Farm at $170 per share. The Board had advised Wattson–Breevast of the December 1 meeting, but Wattson–Breevast had not submitted a written offer or deposit prior to the meeting and had asked that the meeting be postponed. Klebahn stated that after reviewing Grove Farm's upcoming financial needs and the failure of Wattson–Breevast to provide a deposit or written agreement, the Board had decided not to postpone the meeting. Klebahn also informed the stockholders that a lawsuit had been filed by Sheehan.

After questions from the stockholders and discussion, 146 of 176 stockholders approved the merger; these stockholders held 98.9% of the outstanding shares. Including Sheehan, only three stockholders voted against the proposal (27 stockholders did not vote). The other two stockholders who voted against the proposal subsequently tendered their shares and were paid. Sheehan was the only stockholder who voted against the merger who did not tender his shares. Sheehan was the only stockholder who gave written notice to Grove Farm of his intent to demand compensation under Hawaii Revised Statutes (HRS) § 415–81 (1993).

## B. Procedural History

On November 30, 2000, Sheehan filed a Complaint on behalf of himself and "All Oth-

ers Similarly Situated" (the Class). Grove Farm, ALPS Acquisition, Klebahn, Smith, Day, Carswell, Dohrman, Mullins, Pratt, Moore, and Patterson (collectively, Defendants) were served with the Complaint on May 24, 2001.[5] Sheehan sued Klebahn as Chairman and CEO, Smith as Vice President, and Day as Secretary/Treasurer of Grove Farm, and Carswell, Dohrman, Mullins, Pratt, Moore, and Patterson as directors of Grove Farm (collectively, Individual Defendants).

In his Complaint, Sheehan claimed:

(1) Defendants violated their fiduciary duties of care, loyalty, candor, and independence to the stockholders of Grove Farm and were acting in their own self-interest. Sheehan alleged that Defendants unfairly deprived the Class and Sheehan of the true value of their shares in Grove Farm;

(2) Sheehan and the Class suffered monetary damages in an amount to be determined at trial; and

(3) The proxy statement was "materially false in what was represented to the shareholders and what was omitted from the shareholders."

Sheehan asked the circuit court to declare the action properly maintainable as a class action; declare that the Merger Agreement was entered into in breach of Defendants' fiduciary duties and, therefore, was unlawful and unenforceable; enjoin Defendants from consummating the acquisition; direct the Individual Defendants to obtain a transaction that was in the best interests of Grove Farm's stockholders; rescind the acquisition; award compensatory damages against Defendants together with prejudgment interest; impose a constructive trust in favor of Sheehan upon any benefits improperly received by Defendants as a result of their wrongful conduct; award Sheehan costs and reasonable attorneys' and experts' fees; and grant

5. The circuit court filed on June 8, 2001 two notices of dismissal for want of service pursuant to Rule 28 of the Rules of the Circuit Courts of the State of Hawaii. Plaintiff–Appellant Michael G. Sheehan, Sr. (Sheehan) was given five days to show good cause. On June 18, 2001, Sheehan filed his objection to the notices of dismissal and

Sheehan's counsel declared that service had been made upon Defendants via Daniel H. Case, Esq. on May 24, 2001, and, by agreement of counsel, Defendants had been granted an extension of time to answer or otherwise plead to the Complaint.

any further just and equitable relief. Sheehan also demanded a jury trial.

On June 28, 2001, Defendants[6] filed their answer to Sheehan's Complaint. Defendants asserted the following affirmative defenses: failure to state a claim upon which relief may be granted, mootness, lack of standing, statutory bar, laches, waiver, estoppel, and unclean hands. Defendants asked the circuit court to dismiss the Complaint with prejudice, award them attorneys' fees and costs, and grant any other equitable and just relief.

On December 7, 2001, Defendants filed their Motion to Deny Class Certification, arguing that Sheehan could not meet the requirements of Hawai'i Rules of Civil Procedure (HRCP) Rule 23(a) because there was no class of former Grove Farm stockholders who met "the numerosity, commonality and typicality prerequisites for a class action." Defendants also argued that Sheehan could not fairly and adequately protect the interests of any class of Grove Farm stockholders since he was the only stockholder who had both voted against the merger and not yet tendered his shares. Defendants pointed to Sheehan's prayer for rescission, arguing that such a claim was antagonistic to the remaining stockholders who had since tendered their shares.

On January 22, 2002, Sheehan filed his opposition memorandum, and Defendants filed their reply memorandum on January 25, 2002. On February 8, 2002, the circuit court filed its "Order Regarding Defendants' Motion to Deny Class Certification Filed on December 7, 2001," in which the court ordered Sheehan to file his motion to certify the class within 90 days of February 1, 2002 (the date on which Grove Farm had delivered to Sheehan a list of Grove Farm stockholders with their addresses of record). The circuit court further ordered that if Sheehan failed to file his motion to certify the class within

that time, then Defendants' motion to deny class certification would be deemed granted.

On April 30, 2002, Sheehan filed his Motion to Certify Class Action (Motion to Certify Class). Sheehan asserted that he would be moving for leave to file a first amended complaint in which he would drop his prayer for rescission and add several additional tort claims common to the Class.

Sheehan filed his Motion for Leave to File a First Amended Complaint on May 15, 2002. On May 23, 2002, Defendants filed their opposition memorandum, in which they argued that the motion should be denied because Sheehan's proposed first amended complaint (1) failed to comply with HRCP Rule 8(a) because the complaint was verbose, repetitive, and contained extraneous details, and (2) contained an added claim for negligence/gross negligence that would significantly expand the scope of the suit.[7] Sheehan filed his reply memorandum on May 29, 2002. After a hearing on Sheehan's motion, the circuit court filed an order on August 28, 2002 in which the court denied the motion, but granted Sheehan leave to file a second motion for leave to amend his complaint.

On June 10, 2002, Defendants filed their "Memorandum In Opposition to Plaintiff's Motion to Certify Class Action Filed on April 30, 2002." In their memorandum, Defendants argued that even assuming a class existed and that Sheehan fulfilled the numerosity and common questions of law or fact requirements of HRCP Rule 23(a)(1) and (2), Sheehan failed to meet his burden to demonstrate that his claims were typical of the class and that he would fairly and adequately protect the interests of the class. Defendants also argued Sheehan failed to meet his burden of demonstrating that maintenance of the class action was appropriate under one of the criteria of HRCP Rule 23(b). Sheehan filed his reply memorandum ex officio on June 14, 2002. After a hearing on June 18,

---

6. Grove Farm answered on behalf of itself and as the successor in interest to ALPS Acquisition.

7. Hawai'i Rules of Civil Procedure (HRCP) Rule 8(a) provides:

> **Rule 8. GENERAL RULES OF PLEADING.**
> (a) **Claims for relief.** A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain (1) a short and plain statement of the claim showing that the pleader is entitled to relief, and (2) a demand for judgment for the relief the pleader seeks. Relief in the alternative or of several different types may be demanded.

2002, the circuit court filed an order on July 12, 2002 denying the Motion to Certify Class.

On August 27, 2002, Sheehan filed a second "Motion for Leave to File a First Amended Complaint." In his memorandum in support of his motion, Sheehan stated that the circuit court had denied his first motion for leave to amend his complaint in a hearing held in chambers, but had advised him that the court would entertain a renewed motion if the proposed amendments were more narrowly tailored to the original claims of the complaint.

Defendants filed their memorandum in opposition on September 17, 2002. Defendants argued the proposed first amended complaint failed to comply with HRCP Rule 8(a) and the proposed claim for punitive damages was futile and should not be permitted. Sheehan filed his reply memorandum on September 23, 2002.

On September 30, 2002, Sheehan and the parties filed a stipulation that dismissed, without prejudice, all of Sheehan's claims against Smith, Day, and Patterson.

After a hearing on September 26, 2002, the circuit court filed an order on October 7, 2002 granting Sheehan's second motion to amend his complaint. Sheehan filed his First Amended Complaint, naming Appellees as defendants, on October 11, 2002. The First Amended Complaint was served upon counsel for Appellees on October 18, 2002. The First Amended Complaint alleged:

(1) The Board of Directors of Grove Farm breached their fiduciary duties, resulting in the sale of Grove Farm at a discount to the detriment of the stockholders;

(2) The Board failed to act in good faith for the benefit of the stockholders and Grove Farm with respect to the merger with ALPS Acquisition;

(3) The Board failed to exercise informed judgment in connection with the merger;

(4) The Board failed to exercise reasonable care in connection with the merger (negligence/gross negligence)[8]; and

(5) Appellees "acted willfully, wantonly, oppressively, and/or with such malice as to imply a spirit of mischief or criminal indifference to civil obligations, and/or with willful misconduct and/or that entire want of care which would raise a presumption of a conscious indifference to the consequences of their conduct."

Sheehan asked the circuit court to award him compensatory damages, impose a constructive trust in his favor, award punitive damages against Appellees, award him costs and reasonable attorneys' and experts' fees, and grant him other relief deemed just and proper by the court.

On October 28, 2002, Appellees filed their Motion to Dismiss/SJ. Appellees argued that since it was a legal certainty that the actual damages sustained by Sheehan were less than $5,000, the case should be dismissed because the circuit court lacked subject matter jurisdiction. In the alternative, Appellees argued they were entitled to summary judgment on Sheehan's claim for punitive damages (Count V of his First Amended Complaint).

On December 2, 2002, Sheehan filed, ex officio, his opposition to the Motion to Dismiss/SJ. Sheehan argued that his special damages alone would confer jurisdiction upon the circuit court. He asserted that the value of Grove Farm's shares would be calculated by an expert appraiser, who would give testimony on that subject at trial. He also argued he was entitled to punitive damages because of alleged "insider dealing and breach of fiduciary duty" that "rival[ed] the Enron, Tyco, and Qualcomm scandals." Finally, he asserted that if the circuit court was not convinced there was sufficient evidence to deny Appellees' Motion to Dismiss/SJ, then he requested a continuance to complete his discovery of Appellees. Appellees filed their reply memorandum on December 5, 2002.

The hearing on the Motion to Dismiss/SJ was held on December 9, 2002. On February 5, 2003, the circuit court filed its order

---

**8.** Sheehan alleged that the aforementioned breach of fiduciary duties, failure to act in good faith for the benefit of the stockholders and Grove Farm, failure to exercise informed judg-

ment, and negligence/gross negligence resulted in Sheehan receiving less than the full value of his shares.

granting the Motion to Dismiss/SJ and dismissing the case.

Sheehan filed on February 12, 2003 a motion for reconsideration of the order granting the Motion to Dismiss/SJ (Motion for Reconsideration). Sheehan stated that Patricia Wilcox Sheehan (Patricia), "the former owner of 7524 shares of Grove Farm stock," had assigned "all of her claims resulting from said ownership of Grove Farm stock, which are presently pending in the action entitled *Tsukamoto, et al. v. Grove Farm Company, Incorporated, et al.*; Civil No. 02–1–0182" to Sheehan. He argued that as of December 17, 2002, he controlled 7,544 shares (Patricia's 7524 and his 20) of Grove Farm stock and, assuming his damages were at most $1.00 per share, he could meet the jurisdictional minimum. In the alternative, he asked the circuit court to clarify its order dismissing the case because the extent of the order's "scope and effect" were unclear.

On February 12, 2003, Sheehan also filed a "Motion to Consolidate Cases" (Motion to Consolidate). Sheehan asked the circuit court to consolidate his case (Grove Farm I) with *Tsukamoto v. Grove Farm Co.*, Civil No. 02–1–0182 (Grove Farm II), because all of the elements of HRCP Rule 42(a) had been met.[9]

Appellees filed their memorandum in opposition to (1) the Motion to Consolidate and (2) the Motion for Reconsideration on March 3, 2003. Appellees argued (1) the Motion for Reconsideration should be denied because Sheehan failed to present new evidence or arguments for the circuit court to consider, and (2) the Motion to Consolidate should be denied since Grove Farm I was no longer pending before the circuit court. On March 6, 2003, Sheehan filed his replies to Appellees' memorandum in opposition.

The hearing on the Motion for Reconsideration was held on March 11, 2003. On March 25, 2003, the circuit court filed its order denying Sheehan's Motion for Reconsideration and Motion to Consolidate.

On April 7, 2003, Appellees filed their Motion for Taxation of Costs (Motion for Costs). Appellees asked for $17,512.75 in costs, which included charges for deposition transcripts, travel, photocopies, courier services, messenger services, postage, long distance telephone calls, and facsimiles.

The circuit court filed its Final Judgment on April 8, 2003, entering judgment in favor of Appellees and against Sheehan on all counts of the First Amended Complaint. On May 7, 2003, Sheehan filed his notice of appeal from the Final Judgment, which appeal was docketed as No. 25811.

On May 23, 2003, Sheehan filed his opposition to Appellees' Motion for Costs. Sheehan argued that Appellees were not entitled to costs because they were not the "prevailing parties" and even if they were deemed to have prevailed, they were not entitled to reimbursement of all the costs they sought.

Appellees filed their reply memorandum on May 28, 2003. On June 12, 2003, Appellees filed a supplemental affidavit of counsel in support of their Motion for Costs. The affidavit was filed pursuant to the circuit court's instruction to Appellees to break down the telephone and facsimile charges to distinguish between intrastate and interstate communications.

On June 23, 2003, the circuit court filed its "Order Granting in Part Defendants' Motion for Taxation of Costs Filed On April 7, 2003" (Order Granting in Part Costs). The circuit court awarded Appellees $15,260.70, which excluded the requested costs for interstate travel, interstate long distance telephone calls, and interstate long distance facsimiles. On July 18, 2003, the circuit court filed its Judgment on Taxation and Assessment of Costs, entering judgment in favor of Appellees and against Sheehan in the amount of $15,260.70. On August 14, 2003, Sheehan filed, ex officio, his notice of appeal from the

9. HRCP Rule 42(a) provides:

**Rule 42. CONSOLIDATION; SEPARATE TRIALS.**

    **(a) Consolidation.** When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

Judgment on Taxation and Assessment of Costs, which appeal was docketed as No. 26030.

The Hawai'i Supreme Court subsequently consolidated No. 25811 and No. 26030 on November 10, 2003.

## II.

### A. The Circuit Court Filed a Valid Final Judgment.

■ Sheehan appears to argue that this court lacks the jurisdiction to review his appeal because the circuit court dismissed his case for lack of subject matter jurisdiction. He argues the judgment is *"ipso facto* void."

The Hawai'i Supreme Court in *Jenkins v. Cades Schutte Fleming & Wright,* 76 Hawai'i 115, 869 P.2d 1334 (1994), stated:

An appeal may be taken from circuit court orders resolving claims against parties only after the orders have been reduced to a judgment and the judgment has been entered in favor of and against the appropriate parties pursuant to HRCP 58; ... if a judgment purports to be the final judgment in a case involving multiple claims or multiple parties, the judgment ... must (i) identify the claims for which it is entered, and (ii) dismiss any claims not specifically identified[.]

**10.** Sheehan also contends on appeal that the circuit court abused its discretion by "permit[ting] the Appellees to prematurely force the issue of class certification." Particularly, he asserts the circuit court set an arbitrary deadline for Sheehan to move for class certification.

As Appellees point out, there is nothing in the record that demonstrates Sheehan raised these matters with the circuit court. The transcript of the hearing on the Motion to Certify Class is not before this court. The Hawai'i Supreme Court has stated that "[i]ssues not properly raised on appeal will be deemed to be waived." *Pele Defense Fund v. Paty,* 73 Haw. 578, 613, 837 P.2d 1247, 1268 (1992). Therefore, we decline to address this argument.

**11.** HRCP Rule 23 states in relevant part:

**Rule 23. CLASS ACTIONS.**
(a) **Prerequisites to a class action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3)

*Id.* at 119, 869 P.2d at 1338. Sheehan's argument is without merit. The Final Judgment is not "void." The Final Judgment satisfies the requirements under *Jenkins* and is a final judgment for purposes of appeal.

### B. The Circuit Court Did Not Abuse Its Discretion by Denying Sheehan's Motion to Certify Class.

, ■ Sheehan contends the circuit court abused its discretion by denying his Motion to Certify Class because he fulfilled each prong of HRCP Rule 23(a).[10] In his motion, Sheehan sought to certify the following class under HRCP Rule 23(b)(3) [11]:

All shareholders of record as of December 1, 2000, who subsequent to December 1, 1999, were not 1) Officers and/or Directors of Grove Farm Company, Incorporated; 2) members of the law firm of Case, Bigelow, and Lombardi; 3) members of the law firm of Carlsmith Ball, et al; and/or 4) affiliated with ALPS Investment, LLC.

He also described identifiable class members as including "all 160+ shareholders who received the omissive proxy statement, voted without benefit of full disclosure of relevant information concerning the merger, and received less than full value for his or her shares."

the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
(b) **Class actions maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
....
(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Appellees argue the circuit court did not abuse its discretion in denying the Motion to Certify Class because Sheehan failed to show (1) his claims were typical of the class, (2) he could fairly and adequately protect the interests of the class, and (3) maintenance of the class action was appropriate under one of the subdivisions of Rule 23(b).

## 1. Standard of Review and Burden of Proof

"The trial court is vested with broad discretion in deciding whether to certify a class and discretionary authority is normally undisturbed on review." *Levi v. Univ. of Hawaii*, 67 Haw. 90, 92, 679 P.2d 129, 131 (1984). An abuse of discretion occurs if the trial court has "clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 114, 839 P.2d 10, 26 (1992).

In *Life of the Land v. Land Use Commission of Hawaii*, 63 Haw. 166, 623 P.2d 431 (1981), the Hawai'i Supreme Court stated that "[t]he party who seeks to utilize a class action must establish his right to do so." *Id.* at 180, 623 P.2d at 443. The court further stated that the party seeking class certification thus assumes

> a burden of establishing the four prerequisites for class certification delineated in Rule 23(a) and further demonstrating the presence of a suitable situation for the maintenance of a class action under the criteria set forth in at least one of the subdivisions of Rule 23(b). *A failure to satisfy the burden in any respect can result in a denial of the necessary certification.*

*Id.* at 181, 623 P.2d at 443 (footnotes omitted; emphasis added).

## 2. Typicality and Fair/Adequate Protection of Class Interests

Sheehan argues that his claims were representative and typical of the other class members.[12] He maintains that he "received the same fraudulent and omissive information and suffered the same injury as each of the other shareholders of Grove Farm." Moreover, he asserts that he could adequately represent the class.

In *Life of the Land*, the Hawai'i Supreme Court explained:

> We believe the requirement that the representative's claims or defenses be coextensive with those of other class members was designed to be read in conjunction with the fair representation requirement that follows.... Reading the third and fourth preconditions together, we too equate typicality with the absence of conflict of interest.
>
> The fourth predictive finding necessary for a valid class certification, as noted earlier, is one of fair and adequate representation of the entire class. While the adequacy of his counsel is of relevant concern, the representative's ability to speak on behalf of the rest of the class is the more important question here.
>
> *Where claims or defenses are coextensive, there is a probability of fair and adequate representation; where they are potentially conflicting, absentees are unlikely to be afforded representation consistent with notions of fairness and justice.*

*Id.* at 183, 623 P.2d at 444–45 (internal quotation marks, citations, and footnote omitted; emphasis added). The court further explained that "where there is indication that the representative may be particularly interested in a claim or defense unique to him or a subclass, the court is justified in denying class action certification on the grounds of inadequate representation." *Id.* at 184, 623 P.2d at 445 (internal quotation marks, citation, and parentheses omitted).

12. Sheehan asserts this court should examine his claims "[a]gainst the backdrop of the First Amended Complaint." Sheehan filed his Motion to Certify Class on April 30, 2002; the hearing on the Motion to Certify Class was held on June 18, 2002; and the circuit court denied Sheehan's motion on July 12, 2002. Sheehan was not granted leave to amend his complaint until October 7, 2002, and the First Amended Complaint was not served upon Appellees until October 18, 2002. Since the First Amended Complaint was not before the circuit court at the time of its decision, we decline to analyze the motion in the context of the First Amended Complaint.

■ We agree with the United States Court of Appeals for the Second Circuit which held, along lines of reasoning similar to *Life of the Land,* that

class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation. Regardless of whether the issue is framed in terms of the typicality of the representative's claims, Rule 23(a)(3), Fed.R.Civ.P., or the adequacy of its representation, Rule 23(a)(4), Fed. R.Civ.P.,[13] there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2d Cir.1990) (citations omitted; footnote added). *See also Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir. 1992); *Amone v. Aveiro,* 226 F.R.D. 677, 685 (D.Hawai'i 2005); *Daly v. Harris,* 209 F.R.D. 180, 188 (D.Hawai'i 2002).

■ One of the claims of the Complaint alleged misrepresentation on the basis that the proxy statement was materially false. "Negligent misrepresentation requires that: (1) false information be supplied as a result of the failure to exercise reasonable care or competence in communicating the information; (2) the person for whose benefit the information is supplied suffered the loss; and (3) *the recipient relies upon the misrepresentation.*" *Blair v. Ing,* 95 Hawai'i 247, 269, 21 P.3d 452, 474 (2001) (emphasis added). Sheehan admitted in his own pleadings that he was aware of the alleged omissions in the proxy statement prior to the vote on the merger.[14] Since an element of misrepresentation is that the recipient of such information relies upon the misrepresentation, Sheehan would be subject to the defense of non-reliance.

As the United States District Court for the District of Columbia reasoned:

[T]he presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class, as well as bring into question the named plaintiff's representation.

In the instant case, the defendants arguably have an available defense peculiar to the named plaintiffs, in that the plaintiffs voted against the merger for reasons unrelated to any alleged misrepresentations or omissions. Because these plaintiffs did not rely upon the proxy/information statement, they are, therefore, perhaps subject to unique defenses which would not be applicable to other members of the proposed class who were allegedly deceived by the proxy statement and, relying upon it, were thus misled into voting in favor of the merger. This defense, which would be peculiar only to the small subclass which voted against the merger, could likely become a major focus of the litigation.

*Kas v. Fin. Gen. Bankshares, Inc.,* 105 F.R.D. 453, 461–62 (D.D.C.1985) (citation omitted).

Sheehan's defenses would not be coextensive with the class, and, therefore, absentees would be unlikely to be afforded representation consistent with notions of fairness and justice. *Life of the Land,* 63 Haw. at 183, 623 P.2d at 444–45. Accordingly, we hold that the circuit court did not abuse its discretion by denying Sheehan's Motion to Certify Class.

> Plaintiff was a very proactive and interested shareholder. His wife's great, great uncle, G.N. Wilcox, founded Grove Farm in the 1860s. *Because of his interest in the Company, he was contemporaneously aware of Del Mar's offer.* Unfortunately, Mr. Sheehan did not have time to further question the Board or the opportunity to alert his fellow shareholders of the behind-the-scenes dealings or the omissions in the proxy statement in the short period before the proxy vote.

(Emphasis added.)

---

**13.** Federal Rules of Civil Procedure Rule 23(a)(3) and (4) is identical to HRCP Rule 23(a)(3) and (4).

**14.** In his "Memorandum in Opposition to Defendants' Motion to Deny Class Certification," Sheehan stated:

> In order to convince the other shareholders to sell the Company to Mr. Case's son at a steep discount, Defendants prepared and disseminated an omissive proxy statement which failed to inform them of the rival Del Mar $175.00 offer.
> . . . .

## C. The Circuit Court Did Not Err by Granting Appellees' Motion to Dismiss/SJ.

Sheehan contends the circuit court erred by granting Appellees' Motion to Dismiss/SJ because (1) his First Amended Complaint passed facial scrutiny and his punitive damages claim would have tipped the balance in favor of finding jurisdiction, and (2) the record supported Sheehan's contention that the value of the shares was above the jurisdictional amount.[15]

### 1. Standard of Review

■■■ A trial court's grant or denial of a motion to dismiss for "lack of subject matter jurisdiction is a question of law, reviewable *de novo.*" *Norris v. Hawaiian Airlines, Inc.,* 74 Haw. 235, 239, 842 P.2d 634, 637 (1992), *aff'd, Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994). In *Norris,* the Hawai'i Supreme Court adopted the view of the Ninth Circuit Court of Appeals in *Love v. United States,* 871 F.2d 1488, 1491 (9th Cir.1989), *opinion amended on other grounds and superseded by Love v. United States,* 915 F.2d 1242 (9th Cir.1989), that

> review of a motion to dismiss for lack of subject matter jurisdiction is based on the contents of the complaint, the allegations of which we accept as true and construe in the light most favorable to the plaintiff. Dismissal is improper unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Norris,* 74 Haw. at 240, 842 P.2d at 637 (internal quotation marks, citation, and brackets omitted.) "However, when considering a motion to dismiss pursuant to [HRCP] Rule 12(b)(1) the trial court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction."

*Norris,* 74 Haw. at 240, 842 P.2d at 637 (internal quotation marks, citation, and brackets in original omitted; bracketed material added).

### 2. Burden and Standard of Proof

■■ Sheehan contends his burden of establishing jurisdiction should have involved minimal scrutiny and he should have been given the benefit of the doubt. Furthermore, he claims that in order for the circuit court to dismiss his First Amended Complaint, the court had to determine to a legal certainty that the amount Sheehan claimed was less than the jurisdictional minimum.

Hawai'i appellate courts have not previously ruled on the issue of what standard of proof is necessary with respect to whether the amount in controversy meets the minimum required for a court to retain subject matter jurisdiction. The Hawai'i Supreme Court has stated that "in instances where Hawai'i case law and statutes are silent, this court can look to parallel federal law for guidance." *Price v. Obayashi Hawaii Corp.,* 81 Hawai'i 171, 181, 914 P.2d 1364, 1374 (1996).

Sheehan asserts the use of the standard found in *St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845 (1938), where the United States Supreme Court held:

> The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, *the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.* ... But if, from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed or if, from the proofs, the court is satisfied to a like certainty that the

---

**15.** Hawaii Revised Statutes (HRS) § 604–5(b) (Supp.2004) provides in relevant part:

§ 604–5 **Civil jurisdiction.**

. . . .

(b) ... Whenever a civil matter is triable of right by a jury and trial by jury is demanded in the manner and within the time provided by

the rules of court, the case shall be transferred to the circuit court. *If the demand is made in the complaint and the matter is triable of right by a jury, the action may be commenced in the circuit court if the amount in controversy exceeds $5,000.*

(Emphasis added.)

plaintiff never was entitled to recover that amount, and that his claim was therefore colorable for the purpose of conferring jurisdiction, the suit will be dismissed.

*Id.* at 288–89, 58 S.Ct. at 590 (footnotes omitted; emphasis added).

As Appellees point out, *St. Paul Mercury* is distinguishable from the case at hand because Sheehan did not claim any determinate sum of damages.[16] Moreover, as some courts have observed, the "legal certainty" test has limited utility where the plaintiff alleges an indeterminate amount of damages. *St. Paul Reinsurance Co., Ltd. v. Greenberg*, 134 F.3d 1250, 1253 (5th Cir.1998); *accord Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 401–03 (9th Cir.1996).

The United States Supreme Court stated in *McNutt v. General Motors Acceptance Corp. of Indiana, Inc.*, 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936):

> The prerequisites to the exercise of jurisdiction ... are conditions which must be met by the party who seeks the exercise of jurisdiction in his favor. He must allege in his pleading the facts essential to show jurisdiction. If he fails to make the necessary allegations he has no standing. If he does make them, an inquiry into the existence of jurisdiction is obviously for the purpose of determining whether the facts support his allegations.... *As he is seeking relief subject to [the court's] supervision, it follows that he must carry throughout the litigation the burden of showing that he is properly in court. ... If his allegations of jurisdictional facts are challenged by his adversary in any*

appropriate manner, he must support them by competent proof.

*Id.* at 189, 56 S.Ct. at 785 (emphasis added).

In *McNutt*, the Supreme Court was faced with a situation where the complaint was "destitute of any appropriate allegation as to jurisdictional amount save the general allegation that the matter in controversy exceeds $3,000. That allegation was put in issue and the record discloses neither finding nor evidence to sustain it." *Id.* at 181, 56 S.Ct. at 781. The district court's jurisdiction, with respect to the amount in controversy, was limited by statute to "where the matter in controversy exceeds, exclusive of interest and costs, the sum or value of $3,000." *Id.* at 182, 56 S.Ct. at 782.

Like the complaint in *McNutt*, Sheehan's First Amended Complaint was destitute of any allegation as to jurisdictional amount except for his general allegation that his damages exceeded the jurisdictional amount. *See supra* note 16. We follow the *McNutt* holding that the party seeking a court's jurisdiction carries the burden throughout litigation of showing proper jurisdiction and, if jurisdiction is challenged, the party must support its allegation of jurisdiction by competent proof.

### 3. Value of Sheehan's Shares

Sheehan argues that he came forward with "a significant body of factual information supporting damages in excess of the jurisdictional minimum." He highlights that "Mr. Carswell valued the [Grove Farm] stock at $292 per share in early 2000, although he testified that he believed anything between $125 and $150 was a pretty good price."

---

**16.** With regard to the amount of damages claimed, Sheehan alleged the following in his First Amended Complaint:

> 44. As a result of the foregoing, *Plaintiff has been damaged in an amount exceeding the jurisdictional minimum of the court.*
>
> ....
>
> 49. As a result of the foregoing, *Plaintiff has been damaged in an amount which will be proven at trial.*
>
> ....
>
> 55. As a result of the foregoing, *Plaintiff has been damaged in an amount which will be proven at trial.*
>
> ....

> 60. As a result of the foregoing, *Plaintiff has been damaged in an amount which will be proven at trial.*
>
> ....
>
> 62. By reason of the above alleged acts, omissions, or conduct, Defendants acted willfully, wantonly, oppressively, and/or with such malice as to imply a spirit of mischief or criminal indifference to civil obligations, and/or with willful misconduct and/or that entire want of care which would raise a presumption of a conscious indifference to the consequences of their conduct. *Defendants are therefore liable to Plaintiff for punitive damages in an amount to be proven at trial.*

(Emphases added.)

Sheehan also states that "Mr. Combs, a former director and plaintiff in the [Grove Farm II] action, advised his colleagues that he felt just the Mahaulepu beach front was worth millions."

As Appellees point out, to reach the jurisdictional minimum, Sheehan had to prove "that the value of Grove Farm stock in late 2000 was in excess of $402 per share; *i.e.,* that each of his twenty shares was worth $250 more than the ALPS price of $152 per share." At the outset, none of Carswell's valuations support Sheehan's position that the jurisdictional minimum was met. Moreover, a thorough review of Sheehan's memorandum in opposition to the Motion to Dismiss/SJ reveals that Sheehan put forth nothing more than sheer speculation to support his jurisdictional contention. In fact, Sheehan stated in his memorandum that "[a]t trial, the value of the shares of stock for [Grove Farm] will be calculated by and be the subject of expert appraiser testimony."

It is quite evident that even Sheehan did not know what was the amount of his actual damages. There was no proof, much less competent proof, that Sheehan could meet the jurisdictional minimum. *McNutt,* 298 U.S. at 189, 56 S.Ct. at 785. Therefore, the circuit court did not err by granting Appellees' Motion to Dismiss/SJ.

### 4. Punitive Damages

■ Sheehan also argues his punitive damages claim "should have tipped the balance decisively in favor of" him because "[e]xemplary damages permitted by governing law may be included in determining whether a jurisdictional amount in controversy has been met." He asserts that his First Amended Complaint contained the requisite allegations to support a punitive damages claim and, thus, the First Amended Complaint met facial scrutiny and conferred jurisdiction upon the circuit court.

The United States Supreme Court in *Bell v. Preferred Life Assurance Society of Montgomery, Ala.,* 320 U.S. 238, 64 S.Ct. 5, 88 L.Ed. 15 (1943), held that "[w]here both actual and punitive damages are recoverable under a complaint each must be considered to the extent claimed in determining jurisdictional amount." *Id.* at 240, 64 S.Ct. at 6 (footnote omitted). However, as the United States Court of Appeals for the Eighth Circuit pointed out:

> Although punitive damages are included in the amount of [sic] controversy, the existence of the required amount must be supported by competent proof. Indeed, when determining the amount in controversy, a claim for punitive damages is to be given closer scrutiny, and the trial judge accorded greater discretion, than a claim for actual damages.

*Larkin v. Brown,* 41 F.3d 387, 388–89 (8th Cir.1994) (internal quotation marks and citations omitted). *See also Anthony v. Security Pac. Fin. Serv., Inc.,* 75 F.3d 311, 315 (7th Cir.1996); *Packard v. Provident Nat'l Bank,* 994 F.2d 1039, 1046 (3d Cir.1993); *Miller v. European Am. Bank,* 921 F.Supp. 1162, 1167 (S.D.N.Y.1996); *Lindsay v. Kvortek,* 865 F.Supp. 264, 270 (W.D.Penn.1994); *Fritz v. Warner–Lambert Pharm. Co.,* 349 F.Supp. 1250, 1252 (E.D.N.Y.1972). The first step in the inquiry is to determine whether or not punitive damages are available under the applicable law. *E.g., Anthony,* 75 F.3d at 315.

#### a. Hawai'i Punitive Damages Law

■ The Hawai'i Supreme Court in *Masaki v. General Motors Corp.,* 71 Haw. 1, 780 P.2d 566 (1989), gave an overview of the doctrine of punitive damages.

> Punitive or exemplary damages are generally defined as those damages assessed in addition to compensatory damages *for the purpose of punishing the defendant for aggravated or outrageous misconduct* and to deter the defendant and others from similar conduct in the future. Thus, the practice of awarding punitive damages is an exception to the general rule that damages are aimed at compensating the victim for his injuries.
>
> Since the purpose of punitive damages is not compensation of the plaintiff but rather punishment and deterrence, *such damages are awarded only when the egregious nature of the defendant's conduct makes such a remedy appropriate.* Thus, where the

defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime, all but a few courts have permitted the jury to award punitive damages.

71 Haw. at 6, 780 P.2d at 570 (internal quotations marks, citations, brackets, and ellipsis omitted; emphases added). The court described the status of punitive damages law in Hawai'i as follows:

> In *Bright v. Quinn*, 20 Haw. 504, 511 (1911), we declared that "while the propriety of the doctrine has been questioned, it is now too well established to admit of argument that in actions of tort punitive damages may, under certain circumstances, be awarded in addition to such sum as the plaintiff may be found entitled to purely by way of compensation for his injuries and suffering." We went on to describe the aggravated conduct on the part of the defendant which *must be established* in order to justify an award of punitive damages:
>
>> Such damages may be awarded in cases where the defendant "*has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations*"; or where there has been "*some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences.*"
>
> *Id.* at 512 (citations omitted).

71 Haw. at 10–11, 780 P.2d at 572 (brackets in original omitted; emphases added). In determining whether an award of punitive damages is appropriate, the court stated that *the inquiry focuses primarily upon the defendant's mental state*, and to a lesser degree, the nature of his conduct. . . . [T]o justify an award of punitive damages, a positive element of conscious wrongdoing is always required. Thus, *punitive damages are not awarded for mere inadvertence, mistake, or errors of judgment. Something more than the mere commission of a tort is always required for punitive damages.*

71 Haw. at 7, 780 P.2d at 570–71 (internal quotation marks and citations omitted; emphases added).

### b. Sheehan's Punitive Damages Claim

Sheehan's First Amended Complaint alleged (1) breaches of fiduciary duties, (2) failure to act in good faith, (3) failure to exercise informed judgment, and (4) negligence/gross negligence. Sheehan's punitive damages claim asserted:

> By reason of the above alleged acts, omissions, or conduct, Defendants acted willfully, wantonly, oppressively, and/or with such malice as to imply a spirit of mischief or criminal indifference to civil obligations, and/or with willful misconduct and/or that entire want of care which would raise a presumption of a conscious indifference to the consequences of their conduct.

Of the alleged acts, omissions, or conduct, the only act that might have incurred punitive damages was Sheehan's allegation that the Board of Directors provided ALPS [17] and its representatives with insider information concerning Grove Farm and other potential purchasers. We next look to whether it appeared beyond doubt that Sheehan could prove no set of facts in support of his claim that would entitle him to punitive damages. *Norris*, 74 Haw. at 240, 842 P.2d at 637.

In Sheehan's opposition memorandum to the Motion to Dismiss/SJ, Sheehan attached as evidence of insider information having been provided to ALPS and its representatives alleged e-mail notes "provided by Mr. Case which memorialize conversations with Mr. Klebahn." However, when viewed in their entirety, the exhibits present nothing more than strategic discussions between Stephen Case, Daniel Case, and John Agee on acquiring Grove Farm.

After a painstaking review of the record, this court is left with the conclusion that it appears beyond doubt that Sheehan could prove no set of facts to support his claim that Appellees acted "willfully, wantonly, oppressively, and/or with such malice as to imply a

---

**17.** In his First Amended Complaint, Sheehan uses ALPS to mean both ALPS Acquisition and ALPS Investment LLC.

spirit of mischief or criminal indifference to civil obligations, and/or with willful misconduct and/or that entire want of care which would raise a presumption of a conscious indifference to the consequences of their conduct." Since punitive damages were unavailable to Sheehan under Hawai'i law, the circuit court did not abuse its discretion in granting Appellees' Motion to Dismiss/SJ.

### D. The Circuit Court Did Not Abuse Its Discretion by Denying Sheehan's Motion for Reconsideration.

■ Sheehan contends the circuit court erred by denying his Motion for Reconsideration. He argues (1) that as a result of Patricia assigning him her shares in Grove Farm, he could establish to a legal certainty that the circuit court had subject matter jurisdiction, and (2) "[s]ince the initial motion to dismiss was not dispositive on any of [Sheehan's] claims or Appellees' defenses and the [Grove Farm II] action was pending, reconsideration of the dismissal in order to consolidate both actions made a lot of practical sense."

■ Hawai'i Rules of Civil Procedure Rule 60 states in relevant part:

**Rule 60. RELIEF FROM JUDGMENT OR ORDER.**

. . . .

**(b) Mistakes; inadvertence; excusable neglect; newly discovered evidence; fraud, etc.** On motion and upon such terms as are just, the court may relieve a party ... from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other

reason justifying relief from the operation of the judgment.

The Hawai'i Supreme Court has stated:

[T]he purpose of a motion for reconsideration is to allow the parties to present *new evidence and/or arguments that could not have been presented during the earlier adjudicated motion.* Reconsideration is not a device to relitigate old matters or to raise arguments or evidence that could and should have been brought during the earlier proceeding.

*Ass'n of Apartment Owners of Wailea Elua v. Wailea Resort Co., Ltd.,* 100 Hawai'i 97, 110, 58 P.3d 608, 621 (2002) (emphasis added) (quoting *Sousaris v. Miller,* 92 Hawai'i 505, 513, 993 P.2d 539, 547 (2000)).

■ We review a "trial court's ruling on a motion for reconsideration ... under the abuse of discretion standard." *Ass'n of Apartment Owners of Wailea Elua,* 100 Hawai'i at 110, 58 P.3d at 621.

One of the bases of Sheehan's Motion for Reconsideration was Patricia's purported December 17, 2002 assignment to Sheehan of her claims resulting from her ownership of Grove Farm stock. The hearing on the Motion to Dismiss/SJ was on December 9, 2002. The circuit court did not rule from the bench; the court entered its order granting the motion on February 5, 2003. Sheehan had two months within which to make this argument before the circuit court and failed to do so.

Sheehan also argued that the circuit court should have reconsidered its grant of the dismissal so that he could consolidate his case and Grove Farm II. However, Sheehan's counsel filed Grove Farm II at least two months before the circuit court ruled upon the Motion to Dismiss/SJ, and Sheehan could have moved for consolidation before the circuit court's grant of the Motion to Dismiss/SJ.

As the Hawai'i Supreme Court held in *Association of Apartment Owners of Wailea Elua,* 100 Hawai'i at 110, 58 P.3d at 621, a motion for reconsideration is not a device to raise evidence that could and should have been brought to the court's attention during the earlier proceeding. Therefore, the circuit court did not abuse its discretion in

denying Sheehan's Motion for Reconsideration.

### E. The Circuit Court Did Not Abuse Its Discretion by Denying Sheehan's Motion to Consolidate.

■ Sheehan contends the circuit court erred by denying his Motion to Consolidate. He argues that "consolidation was clearly desirable. There were common, if not identical questions of law and fact, discovery would be identical, and the parties were substantially similar. There would have been no delay nor would consolidation have led to confusion or prejudice."

Hawai'i Rules of Civil Procedure Rule 42(a) provides:

### Rule 42. CONSOLIDATION; SEPARATE TRIALS.

(a) Consolidation. When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

In *Kainz v. Lussier*, 4 Haw.App. 400, 667 P.2d 797 (1983), this court stated:

Although Rule 42(a) is designed to encourage consolidation where a common question of law or fact is present, the trial court is given broad discretion to decide whether consolidation would be desirable. The trial court's discretionary determination will not be reversed on appeal absent clear error or exigent circumstances.

*Id.* at 407, 667 P.2d at 803 (internal quotations marks and citations omitted).

As mentioned above, the circuit court denied Sheehan's Motion for Reconsideration. Once the circuit court denied that motion, Sheehan's case was no longer an action pending before the court. Therefore, it was not an abuse of discretion for the circuit court to deny Sheehan's Motion to Consolidate.

### F. The Circuit Court Did Not Abuse Its Discretion or Err by Granting in Part Appellees' Motion for Costs.

■ Sheehan contends the circuit court erred by awarding costs to Appellees because (1) Appellees were not "prevailing parties" under HRCP Rule 54(d) and (2) the costs were unreasonable, unnecessary and/or not reimbursable.

Appellees asked for the following expenses: (1) deposition transcripts—$8,073.01; (2) travel costs—$4,201.57 (interstate and intrastate); (3) photocopies—$3,971.75 ($1,335.56 for outside copying service and $2,636.19 for in-house copying at $.20/page); (4) courier services—$766.81; (5) messenger services—$216.75; (6) postage—$213.20; (7) long distance telephone calls—$20.16 ($12.20 for intrastate and $7.96 for interstate); and (8) facsimiles—$59.50 ($35.00 for local, $7.50 for interstate, and $17.00 for intrastate). In its June 23, 2003 order, the circuit court excluded Appellees' requested costs for their counsel's interstate travel, interstate long-distance telephone charges, and interstate long-distance facsimile charges and awarded Appellees costs of $15,260.70.

#### 1. Standards of Review

■ Hawai'i Rule of Civil Procedure (HRCP) 54(d) provides that, "[e]xcept when express provision therefore is made either in a statute or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs[.]" "The award of taxable cost is within the discretion of the trial court and will not be disturbed absent a clear abuse of discretion." *Bjornen v. State Farm Fire and Cas. Co.*, 81 Hawai'i 105, 107, 912 P.2d 602, 604 (App.1996).

*Wong v. Takeuchi*, 88 Hawai'i 46, 52, 961 P.2d 611, 617 (1998).

■ Whether a cost was unreasonable or unreasonably incurred is a question of law. *Ferrer v. Ngo*, 102 Hawai'i 119, 124, 73 P.3d 73, 78 (App.2003). Questions of law are reviewed upon appeal under the right/wrong standard of review. *Maile Sky Court Co., Ltd. v. City & County of Honolulu*, 85 Hawai'i 36, 39, 936 P.2d 672, 675 (1997).

## 2. Prevailing Parties

Sheehan contends Appellees were not the "prevailing parties" because the dismissal of Sheehan's case was not dispositive since he could refile his action in the District Court of the Fifth Circuit. Sheehan also argues that since the circuit court dismissed his case based on jurisdiction, *Wong v. Takeuchi, supra,* and *Blair v. Ing,* 96 Hawai'i 327, 31 P.3d 184 (2001), are distinguishable.

█ The Hawai'i Supreme Court stated in *Wong:*

Usually the litigant in whose favor judgment is rendered is the prevailing party. Thus, *a dismissal of the action, whether on the merits or not, generally means that defendant is the prevailing party.* There is no requirement that the judgment in favor of the prevailing party be a ruling on the merits of the claims.

88 Hawai'i at 49, 961 P.2d at 614 (internal quotation marks, citation, and ellipsis omitted; emphasis added). In *Blair* and *Ranger Insurance Co. v. Hinshaw,* 103 Hawai'i 26, 79 P.3d 119 (2003), the Hawai'i Supreme Court affirmed the rule stated in *Wong. Blair,* 96 Hawai'i at 331, 31 P.3d at 188; *Ranger,* 103 Hawai'i at 31–32, 79 P.3d at 124–25. We decline Sheehan's invitation to depart from this precedent. Equally unavailing is Sheehan's attempt to distinguish his case from the aforementioned cases based upon the circumstances of the dismissals. The holding of *Wong* is clear on its face: any dismissal, regardless of basis, generally renders the defendant the prevailing party for purposes of awarding costs (and attorneys' fees). We hold that Appellees were "prevailing parties" under HRCP Rule 54(d).

## 3. Unreasonable, Unnecessary and/or Not Reimbursable Costs

█ Sheehan contends that even if Appellees were entitled to their costs, they were not entitled to reimbursement of their deposition, intra- and inter-state travel, photocopying, courier, and unspecified postal, telephone, and facsimile expenses.[18]

Hawaii Revised Statutes § 607–9 (1993) provides:

> **§ 607–9 Cost charges exclusive; disbursements.** No other costs of court shall be charged in any court in addition to those prescribed in this chapter in any suit, action, or other proceeding, except as otherwise provided by law.
>
> All actual disbursements, *including but not limited to, intrastate travel expenses for witnesses and counsel, expenses for deposition transcript originals and copies, and other incidental expenses, including copying costs, intrastate long distance telephone charges, and postage, sworn to by an attorney or a party, and deemed reasonable by the court, may be allowed in taxation of costs.* In determining whether and what costs should be taxed, the court may consider the equities of the situation.

(Emphasis added.)

### a. Depositions

Sheehan argues that Appellees were not entitled to deposition expenses. The statute clearly states that expenses for deposition transcripts and copies, sworn to by an attorney and deemed reasonable by the court, may be allowed in taxation of costs. Sheehan's argument is without merit, and the circuit court did not abuse its discretion by awarding Appellees their requested costs for deposition transcripts.

### b. Intrastate Travel Expenses

Sheehan argues that "[s]ince Appellees selected a Honolulu attorney to represent them on Kauai in light of the fact that there are many competent and well respected Kauai lawyers capable of representing them, they, not Appellant, should pay the additional cost for their convenience." Sheehan also asserts that "Appellees' attempt to recover car rental and parking charges, considering the proximity of the court house and Grove Farm Company officer [sic], is also unreasonable."

Sheehan's argument that Appellees should bear the additional cost of retaining O'ahu attorneys has no merit. The statute specifically provides that intrastate travel expenses

18. We decline to address Sheehan's arguments with respect to Appellees' counsel's interstate travel expenses because the circuit court expressly denied those costs.

**396**

for counsel, sworn to by an attorney and deemed reasonable by the court, may be allowed. As Sheehan pointed out, several of the Appellees resided on Kauaʻi, their depositions were taken on Kauaʻi, and all the hearings were conducted on Kauaʻi. In light of the circumstances of this case, Appellees' counsel's intrastate travel expenses were reasonable.

With respect to Sheehan's second argument, the Hawaiʻi Supreme Court in *Wong* held that "[e]xpenditures for parking, rental car, and gas, while not specifically enumerated in the language of HRS § 607–9, are within the scope of 'intrastate travel expenses.' They are necessary expenditures when traveling intrastate." 88 Hawaiʻi at 54, 961 P.2d at 619. As such, Appellees were entitled to receive the parking and rental car costs as part of their counsel's intrastate travel expenses. The circuit court did not err by granting Appellees their requested intrastate travel expenses.

### c. Photocopying

Sheehan argues Appellees are not entitled to photocopying charges and that the copies were unreasonable and unnecessary. The statute provides that copying expenses, sworn to by an attorney and deemed reasonable by the court, may be allowed in taxation of costs. Appellees were statutorily entitled to recoup their copying expenses and those expenses were not unreasonable. The circuit court did not err by granting Appellees' copying expenses.

### d. Other Costs

Sheehan contends the remaining costs are unreasonable and should not be reimbursable. He brandishes a hodgepodge of arguments in support of his contention. However, a review of the record reveals that his arguments are without merit. We conclude the circuit court did not abuse its discretion or err by granting Appellees the claimed costs.

### IV.

Therefore, the Final Judgment filed on April 8, 2003 and the Judgment on Taxation and Assessment of Costs filed on July 18, 2003 in the Circuit Court of the Fifth Circuit are affirmed.

