LAW LIBRARY

NO. 28773

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

<u>Civil No. 05-1-0166</u>
GUY ST. CLAIR COMBS; MARION WILCOX COMBS; THE SCOTT
MICHAEL ST. CLAIR COMBS IRREVOCABLE TRUST; THE GUY
ST. CLAIR COMBS, III IRREVOCABLE TRUST; THE MARTHA
COMBS TRUST; CATHERINE ANNE MOORE-AIRTH; CHARLES SLOGGETT;
CARLA JORDAN; KRISTEN J. LA DOW; ROBERT B. JORDAN;
MICHAEL P. JORDAN; JONATHAN W. FISHER; ANTHONY H. FISHER;
GALEN M. FISHER; TIMOTHY W. FISHER; RICHARD SLOGGETT, JR.;
GERALD W. FISHER; THE CATHERINE ANNE MOORE-AIRTH
REVOCABLE TRUST; THOMAS JOHNSTON; ANNE SLOGGETT HAMILTON;
ARTHUR W. SLOGGETT; SUSAN CHAMBERLAIN; ERIK PETERSON;
PATRICK FISHER; and SHERRI SLOGGETT-SHANKS,
Plaintiffs-Appellants/Cross Appellees,
v.
CASE BIGELOW & LOMBARDI, a law corporation; DANIEL CASE;
JAMES CRIBLEY; DENNIS LOMBARDI; TOD TANAKA,
Defendants-Appellees/Cross-Appellants,
and
STEPHEN M. CASE; ALPS INVESTMENT LLC; ALPS ACQUISITION
SUB, INC.; THE STEPHEN M. CASE REVOCABLE TRUST; KA PO'E
HANA, LLC; THE GROVE FARM COMPANY, INC.; HUGH M. KLEBAHN;
DONN A CARSWELL; PAMELA W. DOHRMAN; ROBERT D. MULLINS;
WILLIAM D. PRATT; RANDOLPH MOORE; JOHN DOES 1-10; JANE
DOES 1-10; DOE PARTNERSHIPS 1-10; DOE CORPORATIONS 1-10;
DOE LIMITED LIABILITY COMPANIES 1-10; ROE "NON-PROFIT"
CORPORATIONS 1-10; and ROE GOVERNMENTAL ENTITIES 1-10,
Defendants-Appellees

and

<u>Civil No. 06-1-0170</u>
MICHAEL FISHER; SCOTT G. FISHER; PATRICK FISHER;
BARBARA PERRY FISHER, INDIVIDUALLY AND AS TRUSTEE ON
BEHALF OF THE CHARLES FISHER TRUST, Plaintiffs,
v.
STEPHEN M. CASE; ALPS INVESTMENT LLC; THE STEPHEN M. CASE
REVOCABLE TRUST; KA PO'E HANA, LLC; THE GROVE FARM COMPANY,
INC.; CASE BIGELOW & LOMBARDI, a law corporation;
DANIEL CASE; JAMES CRIBLEY; DENNIS LOMBARDI; TOD TANAKA;
JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS 1-10; DOE
CORPORATIONS 1-10; DOE LIMITED LIABILITY COMPANIES 1-10;
DOE "NON-PROFIT" CORPORATIONS 1-10; and DOE GOVERNMENTAL
ENTITIES 1-10, Defendants

APPEAL FROM THE CIRCUIT COURT OF THE FIFTH CIRCUIT

MEMORANDUM OPINION
(By:  Foley, Presiding J.; and Circuit Judges
Del Rosario and Kim, in place of Nakamura, C.J.,
and Fujise and Leonard, JJ., all recused)

Plaintiffs-Appellants/Cross-Appellees Guy St. Clair Combs; Marion Wilcox Combs; The Scott Michael St. Clair Combs Irrevocable Trust; The Guy St. Clair Combs III Irrevocable Trust; The Martha Combs Trust; Catherine Anne Moore-Airth; Charles Sloggett; Carla Jordan; Kristen J. La Dow; Robert B. Jordan; Michael P. Jordan; Jonathan W. Fisher; Anthony H. Fisher; Galen M. Fisher, Timothy W. Fisher, Richard Sloggett, Jr.; Gerald W. Fisher; The Catherine Ann Moore-Airth Revocable Trust; Thomas Johnston; Anne Sloggett Hamilton; Arthur W. Sloggett; Susan Chamberlain; Erik Peterson; Patrick Fisher; and Sherri Sloggett-Shanks (collectively, Appellants) appeal from the "Stipulation and Order for Entry of Final Judgment Pursuant to Rule 54(b) of the Hawaii Rules of Civil Procedure" (Final Judgment) filed on September 11, 2007 in the Circuit Court of the Fifth Circuit (circuit court).[1]

The Final Judgment incorporated by reference the circuit court's February 23, 2007 "Order Granting (1) Motion to Dismiss by Defendants Case Bigelow & Lombardi and James Cribley Pursuant to [Hawaiʻi Rules of Civil Procedure (HRCP) Rules] 12(b)(6) and 9(b), or in the Alternative, Motion for a Stay as to these Defendants; (2) Defendants Dennis Lombardi and Tod Tanaka's Motion to Dismiss Pursuant to HRCP [Rules] 12(b)(6) and 9(b); and (3) Defendant Daniel H. Case's Motion to Dismiss Pursuant to HRCP [Rules] 12(b)(6) and 9(b), or in the Alternative Motion for a Stay as to Daniel H. Case, and Adopting Defendants Case Bigelow & Lombardi and James Cribley's Memorandum in Support of Their Motion to Dismiss Filed on or About October 3, 2006" (Order Granting Motions to Dismiss).

---

[1]  The Honorable Kathleen N. A. Watanabe presided.

2

In accordance with the Order Granting Motions to Dismiss, the circuit court entered final judgment in favor of Defendants-Appellees/Cross-Appellants Case Bigelow & Lombardi (CB&L), James Cribley (Cribley), Dennis Lombardi (Lombardi), Tod Tanaka (Tanaka), (collectively, Attorney Appellees) and Daniel Case (Case) on Counts I (Legal Malpractice), II (Negligence/Gross Negligence), III (Breach of Fiduciary Duty), VIII (Fraud), IX (Constructive Fraud), X (Negligent Misrepresentation), XI (Innocent Misrepresentation),[2] XII (Conspiracy to Defraud), XIII (Securities Fraud -- Title 26 H.R.S. § 485-25 (Securities Fraud)), XIV (Injurious Falsehood),[3] XVI (Participation in Breach of Fiduciary Duty), XVIII (Unjust Enrichment), and XIX (Punitive Damages) of Appellants' Second Amended Complaint, filed August 30, 2006.

On appeal, Appellants contend the circuit court erred by

(1) ruling that Appellants have no standing to sue Attorney Appellees and Case,

(2) dismissing all claims against Attorney Appellees and Case despite material issues of fact regarding whether Attorney Appellees breached duties owed to Appellants, and

(3) awarding costs to Case and the former Board of Directors[4] of The Grove Farm Company, Inc. (Grove Farm) in Tsukamoto et al. v. Grove Farm Company, Inc., Hawai'i Supreme Court Nos. 28626 & 28722 (consolidated).

---

[2] The circuit court dismissed this count with prejudice on June 21, 2006, prior to the filing of the Second Amended Complaint. On appeal, Appellants do not dispute the dismissal of the count.

[3] The circuit court dismissed this count with prejudice on June 21, 2006, prior to the filing of the Second Amended Complaint. On appeal, Appellants do not dispute the dismissal of the count.

[4] Appellants and the plaintiffs in Tsukamoto sued the following former members of the Board of Directors of Grove Farm: Hugh W. Klebahn (Klebahn) (Chairman of the Board and Chief Executive Officer), Donn A. Carswell, Pamela W. Dohrman, Robert D. Mullins, William D. Pratt, and Randolph Moore (collectively, Former Directors).

On cross-appeal, Attorney Appellees and Case argue that the circuit court erred by denying Cribley, Lombardi, Tanaka, and CB&L's Motion for Attorneys' Fees (Attorney Appellees' Motion for Attorneys' Fees) and Case's Motion for Attorneys' Fees.

## I.  BACKGROUND

This case concerns the sale of Appellants' shares in Grove Farm to Case's son, Stephen Case (Stephen) (the transaction).  Case, an attorney at CB&L, represented Stephen in the sale.  Cribley, Lombardi, and Tanaka, also attorneys at CB&L, represented Grove Farm.  Neither Attorney Appellees nor Case represented Appellants directly.

In their Second Amended Complaint, Appellants argued that by representing both the Grove Farm shareholders (alternatively, "Grove Farm Shareholders" and "the Shareholders"), including Appellants, and Stephen in the transaction, Attorney Appellees and Case had negligently breached their fiduciary duties to Appellants.  Appellants also argued that Attorney Appellees and Case had fraudulently induced Appellants to sell their shares in Grove Farm to Stephen for less than fair market value by materially misrepresenting Grove Farm's financial condition and future prospects and Attorney Appellees and Case's relationship to the transaction to induce Appellants to accept Stephen's offer and, thereby, enrich themselves.

On October 2, 2006, Attorney Appellees and Case filed the following motions to dismiss (collectively, Motions to Dismiss):

(1)  CB&L and Cribley's "Motion to Dismiss Pursuant to HRCP [Rules] 12(b)(6) and 9(b), or in the Alternative, Motion for a Stay as to These Defendants" (CB&L/Cribley's Motion to Dismiss);

(2)  Lombardi and Tanaka's "Motion to Dismiss Pursuant to HRCP [Rules] 12(b)(6) and 9(b)" (Lombardi/Tanaka's Motion to Dismiss) (the above motion and this motion collectively, Attorney Appellees' Motions to Dismiss); and

4

(3) Case's "Motion to Dismiss Pursuant to HRCP [Rules] 12(b)(6) and (9)(b), or in the Alternative Motion for a Stay as to Daniel H. Case and Adopting Defendants Case Bigelow & Lombardi and James Cribley's Memorandum in Support of Their Motion to Dismiss Filed on or About October 3, 3006" (Case's Motion to Dismiss).

In the Motions to Dismiss, Attorney Appellees[5] and Case argued[6] the following:

(1) Appellants lacked standing to assert their claims because they failed to show that Attorney Appellees or Case owed Appellants a duty;

(2) Appellants' claims grounded in fraud -- Counts VIII (Fraud), IX (Constructive Fraud), X (Negligent Misrepresentation), XII (Conspiracy to Defraud), and XIII (Securities Fraud) -- should be dismissed because Appellants failed to make specific allegations, as required under HRCP Rule 9(b); and

(3) Appellants' fraud and misrepresentation claims should fail because Attorney Appellees made no misrepresentation to Appellants and Appellants could not establish reliance on any such misrepresentations.

On November 3, 2006, Appellants filed "Plaintiffs' Consolidated Opposition to (1) the Attorney Defendants' Motion to Dismiss or in the Alternative for a Stay as to Certain Defendants; (2) [Lombardi and Tanaka's] Motion to Dismiss; and (3) All Substantive Joinders to these Motions" (Opposition to the Motions to Dismiss). Appellants argued that Attorney Appellees and Case

> owed fiduciary, statutory and common law duties to Grove Farm and its constituent [S]hareholders as counsel to [Grove Farm], counsel to the directors and company Board, [and] counsel to Special Committee. At base, they helped a third-

---

[5] Lombardi/Tanaka's Motion to Dismiss provided that Lombardi and Tanaka joined in CB&L/Cribley's Motion to Dismiss.

[6] Case's Motion to Dismiss provided that Case "adopt[ed] the arguments set forth in [CB&L/Cribley's Motion to Dismiss]."

> party -- their leader, [Stephen], cheat, defraud and profit from Grove Farm's stockholders. In the process, they violated duties *inter alia* to maintain client confidences, to make disclosures to clients and to refrain from profiting themselves or aiding other people to profit from information they learned in a fiduciary capacity. As counsel in the transaction, they also owed duties to speak up, and to disclose any information known to the law firm that was material to [S]hareholders' decision to sell. The breach of these duties gave rise *inter alia* to [Appellants'] claims against the Attorney [Appellees and Case].

(Footnote omitted.) Appellants argued that Attorney Appellees and Case owed duties to Appellants "just like the directors did because Grove Farm was being sold" and "public policy considerations require that attorneys owe a duty to shareholders when advising a company board and special committee in connection with a potential sale or merger."

The circuit court filed its Order Granting Motions to Dismiss with prejudice.

On March 5, 2007, Appellants filed a "Motion for Partial Reconsideration of the Court's [Order Granting Motions to Dismiss] and for Reinstatement of [Case], [Cribley], and [CB&L] as Party Defendants Herein," which the circuit court denied on June 7, 2007.

On September 25, 2007, Case filed a Motion for Attorneys' Fees and Costs, and Attorney Appellees filed their Motion for Attorneys' Fees and a Motion for Taxation of Costs. The circuit court awarded costs to Attorney Appellees and Case, but denied their requests for attorneys' fees.

## II. STANDARDS OF REVIEW

### A. Dismissal of Complaint

This court reviews a dismissal of a complaint under HRCP Rule 12(b)(6) *de novo*. <u>Bacerra v. MacMillan</u>, 111 Hawaiʻi 117, 119, 138 P.3d 749, 751 (2006). HRCP Rule 12(b)(6) provides that "the following defenses may at the option of the pleader be made by motion: . . . (6) failure to state a claim upon which relief can be granted."

B.     Standing

"Because standing is a jurisdictional issue that may be addressed at any stage of a case, an appellate court has jurisdiction to resolve questions regarding standing, even if that determination ultimately precludes jurisdiction over the merits." Kaho'ohanohano v. State, 114 Hawai'i 302, 324, 162 P.3d 696, 718 (2007) (internal quotation marks, citation, and brackets omitted).

> "Whether the circuit court has jurisdiction to hear the plaintiffs' complaint presents a question of law, reviewable *de novo*. A plaintiff without standing is not entitled to invoke a court's jurisdiction. Thus, the issue of standing is reviewed *de novo* on appeal." *Right to Know Comm. v. City Council, City & County of Honolulu*, 117 Hawai'i 1, 7, 175 P.3d 111, 117 (App. 2007) (internal quotation marks and citations omitted).

County of Kaua'i v. Office of Info. Practices, State of Hawai'i, 120 Hawai'i 34, 39, 200 P.3d 403, 408 (App. 2009).

C.     Duty of Care

The appellate courts address "whether a defendant owes a duty of care to a particular plaintiff as a question of law under the right/wrong standard." Blair v. Ing, 95 Hawai'i 247, 253, 21 P.3d 452, 458 (2001) (Blair I).

D.     Harmless Error

Hawaii Rules of Evidence Rule 103(a) provides in relevant part:  "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected."

E.     Statutory Interpretation

"The standard of review for statutory construction is well-established.  The interpretation of a statute is a question of law which this court reviews *de novo*.  Where the language of the statute is plain and unambiguous, our only duty is to give effect to its plain and obvious meaning." Liberty Mut. Fire Ins. Co., v. Dennison, 108 Hawai'i 380, 384, 120 P.3d 1115, 1119 (2005) (internal quotation marks and citation omitted).

7

### F.  Attorney's Fees

> This court reviews the circuit court's denial
> and granting of attorney's fees under the abuse of
> discretion standard.  The trial court abuses its
> discretion if it bases its ruling on an erroneous view
> of the law or on a clearly erroneous assessment of the
> evidence.  Stated differently, an abuse of discretion
> occurs where the trial court has clearly exceeded the
> bounds of reason or disregarded rules or principles of
> law or practice to the substantial detriment of a
> party litigant.

*Ranger Ins. Co. v. Hinshaw*, 103 Hawaii 26, 30, 79 P.3d 119,
123 (2003) (quoting *TSA Int'l Ltd. v. Shimizu Corp.*, 92
Hawai'i 243, 253, 990 P.2d 713, 723, *reconsideration denied,*
(1999)).

Price v. AIG Hawai'i Ins. Co., Inc., 107 Hawai'i 106, 110, 111
P.3d 1, 5 (2005).

### III.

### A.  APPEAL

### 1.  Motions to Dismiss

In the Order Granting Motions to Dismiss, the circuit
court did not specify on what grounds it granted the motions.

#### a.  Standing

On appeal, Appellants maintain, in sum, that (1)
because the subject transaction was a sale, the directors of
Grove Farm owed a fiduciary duty to Appellants (although normally
directors of a corporation do not owe individual shareholders
such a duty); (2) because "attorney duties and directors' duties
are in a real sense intertwined, and follow one another,"
Attorney Appellees and Case owed a fiduciary duty to Appellants
(although attorneys representing corporations normally do not owe
individual shareholders such a duty); and (3) Attorney Appellees
and Case breached their fiduciary duties to Appellants.
Appellants largely base their argument on various state and
federal cases outside of this jurisdiction.

In the Motions to Dismiss, Attorney Appellees and Case
argued that Appellants lacked standing to assert their claims
because Attorney Appellees and Case owed Appellants no duty,
including a duty to report to Appellants alleged violations on

8

the part of Former Directors. Attorney Appellees and Case contended that Appellants' claims belonged to Grove Farms only.

HRCP Rule 12(b)(6) provides in relevant part that "[e]very defense, in law or fact, to a claim for relief in any pleading . . . shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: . . . (6) failure to state a claim upon which relief can be granted[.]"

"It is well-settled that courts must determine as a threshold matter whether they have jurisdiction to decide the issues presented. If a party is found to lack standing, the court is without subject matter jurisdiction to determine the action." <u>Hawaii Med. Ass'n v. Hawaii Med. Serv. Ass'n, Inc.</u>, 113 Hawai'i 77, 94, 148 P.3d 1179, 1196 (2006) (citations omitted).

In <u>Hanabusa v. Lingle</u>, 119 Hawai'i 341, 347, 198 P.3d 604, 610 (2008), the Hawai'i Supreme Court stated the following with regard to standing:

> "Standing is concerned with whether the parties have the right to bring suit." *Mottl v. Miyahira,* 95 Hawai'i 381, 388, 23 P.3d 716, 723 (2001) (quoting *Pele Defense Fund v. Puna Geothermal Venture,* 77 Hawai'i 64, 67, 881 P.2d 1210, 1213 (1994)).
>
> It is well settled that the crucial inquiry with regard to standing is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his or her invocation of the court's remedial powers on his or her behalf. *In re Application of Matson Navigation Co. v. Federal Deposit Ins. Corp.,* 81 Hawai'i 270, 275, 916 P.2d 680, 685 (1996). In deciding whether the plaintiff has the requisite interest in the outcome of the litigation, we employ a three-part test: (1) has the plaintiff suffered an actual or threatened injury as a result of the defendant's wrongful conduct; (2) is the injury fairly traceable to the defendant's actions; and (3) would a favorable decision likely provide relief for plaintiff's injury. *Bush v. Watson,* 81 Hawai'i 474, 479, 918 P.2d 1130, 1135 (1996).
>
> With respect to the first prong of this test, the plaintiff "must show a distinct and palpable injury to himself [or herself.]" *Life of the Land v. Land Use Commission of State of Hawai'i,* 63 Haw. 166, 173 n.6, 623 P.2d 431, 446 n.6 (1981). The injury must be "distinct and palpable, as opposed to abstract, conjectural, or merely hypothetical." *Doyle v. Oklahoma Bar Ass'n,* 998 F.2d 1559, 1566 (10th Cir. 1993) (citations omitted).

*Mottl*, 95 Hawai'i at 389, 23 P.3d at 724, quoting *Akinaka v. Disciplinary Bd. of Hawai'i Supreme Court*, 91 Hawai'i 51, 55, 979 P.2d 1077, 1081 (1999). The requirement of a "distinct and palpable injury" requires a plaintiff to have suffered an "injury in fact." *Mottl*, 95 Hawai'i at 391, 23 P.3d at 726.

Although Appellants do not do so on appeal, in this discussion we distinguish between Case, who represented Stephen, and Attorney Appellees, who represented Grove Farm in the transaction.

### (1) Breach of Fiduciary Duty

In their Second Amended Complaint, Appellants argued that Case and Attorney Appellees breached their fiduciary duties to Appellants. Appellants maintained that Case and Attorney Appellees' duties extended to Appellants "both directly under the circumstances and as intended and known third-party beneficiaries of the attorney-client relationships between Attorney [Appellees] and Grove Farm, its subsidiaries, its Board of Directors and the Special Committee of the Board." Appellants did not explain in their Second Amended Complaint how they were third-party beneficiaries, nor do they do so in the instant appeal.

### (a) Case

We recently held in a related case, <u>Tsukamoto v. Grove Farm Co., Inc.</u>, No. 28626, 2009 WL 5117005, at 32-34 (Hawai'i App. December 29, 2009), that Grove Farm Shareholders did not have standing to bring their breach-of-fiduciary-duty claim against Case. After the Shareholders filed their Second Amended Complaint, Case filed a Motion for Summary Judgment, in which he argued that he was entitled to be dismissed by summary judgment because he had no duty to the Shareholders since neither he nor CB&L had ever been an attorney for them and the Former Directors had no duties to them. <u>Id.</u> at 30. Case added that there was no conflict of interest when he acted as Stephen's agent in Stephen's purchase of Grove Farm. <u>Id.</u> Case also argued that the Shareholders could not show that a genuine issue of material fact existed with regard to the conspiracy to defraud claim. <u>Id.</u>

We agreed in <u>Tsukamoto</u> that the Shareholders lacked standing to bring their breach-of-fiduciary-duty claim against Case and held that Case had no duty to the Shareholders because (1) there was no contractual relationship between Case and the Shareholders and (2) Case represented Stephen and not Grove Farm or the Shareholders in the transaction. <u>Id.</u> at *32. We also concluded that there was no merit to the Shareholders' allegation that Case owed a duty to them just because he was a partner and chairman of the board of CB&L. <u>Id.</u>

Like the Shareholders in <u>Tsukamoto</u>, Appellants in this case do not have standing to bring their breach-of-fiduciary claim against Case.

### (b) Attorney Appellees

"It is a well[-]established rule both in Hawai'i and in a majority of the States that the relation of directors to the corporations they represent is a fiduciary one." <u>Taniguchi v. Ass'n of Apt. Owners of King Manor, Inc.</u>, 114 Hawai'i 37, 50, 155 P.3d 1138, 1151 (2007) (internal quotation marks and citation omitted). Although the "established law is that corporate officers, directors, or shareholders are not personally liable for the tortious conduct of the corporation or its agents," <u>Eastern Star, Inc., S.A. v. Union Bldg. Materials Corp.</u>, 6 Haw. App. 125, 134, 712 P.2d 1148, 1155 (1985) (internal quotation marks and citation omitted), where the officers, directors, or shareholders actively or passively participate in the tortious conduct, "they are not shielded by the corporation and will be personally liable" for such. <u>Id.</u> at 135, 712 P.2d at 1155 (internal quotation marks and citation omitted).

"[S]tockholders . . . of a corporation do not have the right to pursue an action on their own behalf when the cause of action accrues to the corporation." <u>Joy A. McElroy, M.D., Inc. v. Maryl Group, Inc.</u>, 107 Hawai'i 423, 431, 114 P.3d 929, 937 (App. 2005) (internal quotation marks and citation omitted). "Where the basis of the action is a wrong to the corporation, redress must be sought in a derivative action." <u>Chambrella v.</u>

11

Rutledge, 69 Haw. 271, 280, 740 P.2d 1008, 1013 (1987) (internal quotation marks and citation omitted). However, "[i]f the injury is one to the plaintiff as a shareholder and to him individually, and not to the corporation, as where the action is based on a contract to which he is a party, or on a right belonging severally to him, or on a fraud affecting him directly, it is an individual action." Id. at 280, 740 P.2d at 1013-14 (internal quotation marks, citation, brackets, and footnote omitted).

In the instant case, Appellants argue that because they have standing to bring an individual action against Former Directors, they also have standing to bring an individual action against Attorney Appellees because "attorney duties and directors' duties are in a real sense intertwined, and follow one another." Appellants offer no authority for this contention, and we find none in this jurisdiction.

In Tsukamoto, we addressed for the first time the issue of whether shareholders of a closely held corporation have standing to sue an attorney representing that corporation for breach-of-fiduciary duty, notwithstanding that the attorney is not acting as counsel for those shareholders. 2009 WL 5117005, at *32-33. There, we cited to a number of cases outside this jurisdiction before adopting "the generally accepted rule that an attorney for a closely held corporation owes no duty to individual shareholders." Id. In support for our holding, we cited to Hawai'i Rules of Professional Conduct Rule 1.13. Tsukamoto, 2009 WL 5117005, at *33. Finally, we held that the circuit court had not been wrong to dismiss the breach-of-fiduciary-duty claim against Case. Id. at *32.

In Tsukamoto, we also discussed whether the Shareholders had standing under the theory that they were third-party beneficiaries of the attorney-client relationship between Grove Farm and its attorneys. 2009 WL 5117005, at *34. Citing to Blair I, 95 Hawai'i at 255, 21 P.3d at 460, we held that the Shareholders were not third-party beneficiaries because there was no evidence in the record on appeal that Grove Farm had retained

its attorneys for the purpose of conferring a benefit to the Shareholders. Tsukamoto, 2009 WL 5117005, at *34.

Given the foregoing, Appellants in this case lack standing to assert their breach-of-fiduciary-duty claim against Attorney Appellees.

### (2) Negligence Claims

The Second Amended Complaint claimed that Case and Attorney Appellees committed legal malpractice, negligence/gross negligence, and negligent misrepresentation (negligence claims) against Appellants. It is a "basic principle that a negligence action lies only where there is a duty owed by the defendant to the plaintiff." Birmingham v. Fodor's Travel Publ'ns, Inc., 73 Haw. 359, 366, 833 P.2d 70, 74 (1992). As we have already discussed, neither Case nor Attorney Appellees owed a duty to Appellants. Therefore, Appellants lacked standing to assert negligence claims against Case and Attorney Appellees.

### (3) Participation in Breach of Fiduciary Duty

The Second Amended Complaint alleged against Case a claim based on the tort of participation-in-breach-of-fiduciary duty. We are unable to find a case in this jurisdiction construing that tort. Nevertheless, a survey of cases in other jurisdictions reveals no requirement that a fiduciary relationship exist between the party who allegedly participated in a breach-of-fiduciary duty and the party who was harmed by it. See, e.g., Meadows v. Hartford Life Ins. Co., 492 F.3d 634, 639 (5th Cir. 2007) ("To establish a claim for knowing participation in a breach of fiduciary duty, a plaintiff must assert: (1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship."); In re Greater Se. Cmty. Hosp. Corp. I, 353 B.R. 324, 359-60 (Bankr. D. D.C. 2006) (internal quotation marks and citation omitted) ("Aiding and abetting the breach of fiduciary duty occurs when the defendant knows that the other's

13

conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other's nonetheless."); Kaufman v. Cohen, 307 A.D.2d 113, 125, 760 N.Y.S.2d 157, 169 (N.Y. App. Div. 2003) ("A claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach.").

Appellants had standing to assert participation in breach of fiduciary duty against Case, and the circuit court should not have dismissed that claim on the basis that Appellants lacked standing. Nevertheless, the court's error was harmless because Appellants failed to state a claim upon which relief could be granted, pursuant to HRCP Rule 12(b)(6), since, as we have already discussed, Attorney Appellees had no fiduciary duty to Appellants.

### (4) Fraud Claims

The Second Amended Complaint alleged that Case and Attorney Appellees committed constructive fraud, securities fraud, fraud, and conspiracy to defraud.

### (a) Constructive Fraud

In Wolfer v. Mutual Life Ins. Co. of New York, 3 Haw. App. 65, 76-77, 641 P.2d 1349, 1357 (1982), this court stated the following:

> Constructive fraud is defined as an act done or omitted which is construed as a fraud by the court because of its detrimental effect upon public interests and public or private confidence, even though the act is not done or omitted with an actual design to perpetrate actual fraud or injury. 37 Am. Jur. 2d, Fraud and Deceit, § 4.
>
> Constructive fraud often exists where the parties to a transaction have a special confidential or fiduciary relation which affords the power and means to one to take undue advantage of, or exercise undue influence over, the other. Id., § 5.
>
> Relationships between trustee and beneficiary, principal and agent, and attorney and client are familiar examples in which the principle of fiduciary or confidential relationship applies in its strictest sense. Its operation, however, is not limited to dealings between parties standing in such relations, but extends to all instances when a

14

> fiduciary or confidential relation exists as a fact, in
> which there is confidence reposed on one side and a
> resulting superiority and influence on the other. Id.,
> § 16.

(Emphases added.) In the instant case, as we have already discussed, Case and Attorney Appellees had no fiduciary duty to Appellants. Further, the evidence on appeal reveals no special confidential relationship between Appellants and Case or Attorney Appellees. Appellants had no standing to assert their constructive fraud claim against Case and Attorney Appellees.

### (b) Securities fraud

Hawaii Revised Statutes (HRS) § 485-25(b) (1993) provides:

> §485-25 Fraudulent and other prohibited practices.
> . . . .
>
> (b) It is unlawful for any person who receives any consideration from another person primarily for advising the other person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise:
>
> (1) To employ any device, scheme, or artifice to defraud the other person; or
>
> (2) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon the other person.

(Emphasis added.) Because, as we have discussed, Appellants had no attorney-client relationship with Case or Attorney Appellees, neither Case nor Attorney Appellees "receive[d] any consideration from" Appellants "for advising" Appellants. HRS § 485-25(b). Therefore, based on the plain language of HRS § 485-25(b), Appellants had no standing to assert a securities-fraud claim against Case or Attorney Appellees.

### (c) Fraud and Conspiracy to Defraud

In Tsukamoto, we held that a fraud claim requires no fiduciary relationship between the party alleging fraud and the party against whom fraud is being alleged. 2009 WL 5117005, at *35. Hence, here, Appellants have standing to bring their fraud and conspiracy-to-defraud claims against Case and Attorney Appellees despite the absence of a fiduciary relationship between

15

Appellants and Case or Attorney Appellees, and the circuit court abused its discretion by dismissing those counts on the basis of Appellants' lack of standing. Nevertheless, the error was harmless because Appellants failed to state a claim upon which relief could be granted, pursuant to HRCP Rule 12(b)(6), with regard to those counts.

In the Second Amended Complaint, Appellants argued, in relevant part, the following:

(1) On September 15, 1999, a letter[7] signed by Klebahn and reviewed and edited by Cribley was sent to Appellants. The letter misled Grove Farm Shareholders by implying there was no outside capital source available when actually Saxon-Ravenscraig Group (Saxon-Ravenscraig), an eager *bona fide* outside investor, was willing to act as source for the sort of capital infusion Klebahn said was needed. Cribley was aware of the letter, and

---

[7] The letter stated, in relevant part, the following:

The assets of [Grove Farm] are encumbered beyond a prudent level and the funds being generated from down sized [sic] operations are just barely sufficient to cover operating costs including current debt service. An engineering study regarding the Kukui Grove Shopping Center indicates that [Grove Farm] will have to spend approximately $1.5 million over the next two years to repair the Center. Interest by prospective tenants in the Center is minimal. The former JC Penny and Woolworth spaces (approximately 70,000 square feet) remain vacant. Extensive contacts with prospective national tenants have proved negative. Prospects show interest, visit the property, and then reject any further consideration.

***

Grove Farm cannot save its way into prosperity; the economy must help. It will take a large amount of new capital to realize Grove Farm's potential. These funds will have to come either from the sale of assets or from an outside source investor. It is capital requirement that puts a lid on the value of [Grove Farm] stock today.

***

. . . The challenge for the Board is to find an infusion of capital into [Grove Farm]. No alternative will remain unexplored. We will do what is necessary. No stone will be left unturned as we analyze alternatives and chart a course.

(Brackets in original omitted; ellipses and asterisks within paragraphs omitted.)

Attorney Appellees did not correct or supplement the information provided in it.

(2)  Klebahn wrote and sent and Cribley reviewed, edited, and/or approved a letter dated November 30, 1999 to Grove Farm Shareholders, in which Klebahn stated that Grove Farm's value, according to a County of Kaua'i assessment, was $27.5 million and Grove Farm's adjusted value, according to Klebahn, was $12.8 million.  Klebahn failed to mention that Grove Farm's value in 1999 was $156 million and that the $27.5 million figure largely reflected only the value of Grove Farm's agricultural land.

(3)  On December 13, 1999, Scott Blum (Blum) formally submitted an offer to acquire Grove Farm's stock for $21 million, or $125 per share.  Attorney Appellees, along with Former Defendants, relayed the Blum offer to Shareholders, without telling the Shareholders about Saxon-Ravenscraig's offer.

(4)  Cribley drafted a letter, sent to Shareholders on February 2, 2000, that was "calculated to lead and in fact led [Grove Farm] [S]hareholders to believe that qualified, independent outside advisors were being retained" to advise a special committee made up of Grove Farm board members (Special Committee) on strategic alternatives available to Grove Farm and valuate Grove Farm.  However, "Defendants" did not honor the "pledges" contained in the letter.  On CB&L's suggestion, the Special Committee chose Aspen Venture Group (Aspen) to advise them, when Aspen was a "front," set up by Michael Burns, a convicted white-collar felon, "who used it as a Trojan horse to get inside Grove Farm in preparation for a take-over bid." Attorney Appellees either did not know that Aspen was an inappropriate or unbiased choice or knew of Burns's conviction and disregarded or suppressed the information.

(5)  At a May 8, 2000 Grove Farm Shareholders' meeting, the Special Committee made available to the Shareholders Aspen's first written report, valuing Grove Farm's shares at $86 to $98 each.  Aspen had written a second report on the strategic

17

alternatives available to Grove Farm, but the Special Committee provided the Shareholders with only a summary of the report. Also at that meeting, Attorney Appellees failed to inform Shareholders that tax assessment records showed Grove Farm's real estate holdings to be worth more than $80 million above and beyond its total debts and that Grove Farm had millions of dollars in cash on hand and expected to have millions more in 2000. Further, at the meeting, Cribley, knowing it to be false, stated that Grove Farm land could not be "condominiumize[d]" and stated that individual real estate parcels outside the Kukui Grove Shopping Center area and Lihue-Puhi Housing Development[8] (Housing Development) could not be sold, which he knew or should have known was not true.

(6) The Special Committee failed to inform Grove Farm Shareholders that Kaua'i County had approved a request to rezone a 16.9 acre parcel of Grove Farm property (the 16.9 acre parcel), thereby enabling Grove Farm to sell it outright for $10 to $30 million or more. Attorney Appellees failed to inform Shareholders that Hyatt had wanted to lease the rezoned land "for $1.2 million per year (plus future CPI increases)" to improve cash flow.

(7) On June 2, 2000, a letter authored by Cribley was sent to Grove Farm Shareholders, explaining that the Special Committee was going to stage an auction of Grove Farm among competing bidders who would be treated equally, but Attorney Appellees "employed and manipulated the five-step process [bidders were required to follow] to favor Stephen."

(8) On July 11, 2000, Klebahn reported to the Special Committee, but failed to tell Combs, that the Kukui Grove

---

[8] Paragraph 56 of the Second Amended Complaint provides:

56. As of 2000, [Grove Farm] held title to a 989-acre portion of Grove Farm commonly referred to as the Lihue-Puhi Housing Development (the "Housing Development"). This project included the Billy Casper Golf Course, the Hyatt Golf Course . . ., a sewer property and numerous real estate parcels[.]

Shopping Center was worth $20 million net of debt and repairs and Grove Farm had sufficient cash to meet its obligations through the first three months of 2001. Attorney Appellees continued to actively and openly collude with Former Directors to defraud Grove Farm Shareholders into selling their shares to Stephen for less than fair market value.

(9) Attorney Appellees continued to tout Aspen's valuation of Grove Farm, even when the commercial loan department of Bank of Hawaii (BOH) notified the Special Committee on July 27, 2000 that Kaua'i County had assessed Grove Farm's value at $146 million for 2000, which BOH stated was "significantly different" than Aspen's $129 million valuation.

(10) Attorney Appellees did not notify Grove Farm Shareholders that Sears began leasing an additional 42,150 square feet in the Kukui Grove Shopping Center, representing $500,000 in additional revenue per year, despite Attorney Appellees' promise to keep Shareholders abreast of any material developments.

(11) Prior to the December 1, 2000 vote on whether to sell Grove Farm to Stephen, Grove Farm Shareholders were not made aware of a contract by Schuler Homes to buy developed residential lots in the Housing Development for $2.3 million.

(12) Grove Farm Shareholders were never told that in September and October 2000, Scott Parker of Trust for Public Lands offered to purchase "the entire Ahupua'a of Mahaulepu."

(13) Grove Farm Shareholders were not told that CB&L had commissioned an appraisal of Grove farm for Stephen, and Shareholders were not privy to the appraisal results.

(14) At no time before December 1, 2000 did Case or the other CB&L partners inform Grove Farm Shareholders that a BOH internal real estate appraisal memorandum revealed that the revised market value of Grove Farm land was $152,700,000.

(15) The October 30, 2000 offer letter by Wattson-Breevast was not sent to Grove Farm Shareholders.

19

(16) A "Prospectus" or "Proxy Statement"[9] principally drafted by Case and Cribley and disseminated to Grove Farm Shareholders by Case and CB&L partners "materially misrepresented the financial condition of [Grove Farm], and its relationship to [CB&L] and ALPS."[10]

Appellants argued that had Grove Farm Shareholders "known of all material information germane to the value of [Grove Farm], the proposed sale to ALPS would not have garnered approval of the requisite seventy-five percent (75%) supermajority of the Shareholders."

---

[9] The introduction to the Proxy Statement provides in relevant part:

[Grove Farm] . . . has agreed to be acquired by ALPS Investment LLC . . . through a merger transaction. As a result of the merger, each of [Grove Farm's] stockholders . . . will receive $152.00 for each share of common stock that they own.

A special meeting of stockholders (the "Special Meeting") will be held at 9:00 a.m. on December 1, 2000 . . . to vote on the merger proposal. [Grove Farm's] Board of Directors has approved the merger and recommend that [Grove Farm's] stockholders vote FOR the merger proposal at the Special Meeting. Information about the merger and the Special Meeting is contained in this Proxy Statement.
     . . . .

At the Special Meeting, [Grove Farm's] stockholders will be asked to consider and vote upon a proposal to approve the Agreement and Plan of Merger dated October 17, 2000 (the "Merger Agreement") between [Grove Farm], ALPS Investment LLC and ALPS Acquisition Sub, Inc. ("Acquisition Sub").
     . . . .

The Board of Directors believes that the Merger Agreement is fair and in the best interests of the stockholders and recommends that you vote FOR approval of the Merger Agreement.

The Proxy Statement included chapters entitled "Overview," "The Merger Transaction," "The Merger Agreement," and "The Meeting and Voting."

[10] ALPS Investment LLC (ALPS LLC) was a company engaged in general investments and owned by the Stephen M. Case Revocable Living Trust. Sheehan v. Grove Farm Co., Inc., 114 Hawai'i 376, 381, 163 P.3d 179, 184 (2005). ALPS LLC was managed by Ka Po'e Hana LLC, of which the president was John Agee and the owners were Mr. and Mrs. Stephen Case. Id. ALPS LLC submitted a Merger Agreement to Grove Farm's Board of Directors. Id. The Merger Agreement provided that ALPS Acquisition Sub, Inc., a corporation formed by ALPS LLC for the purpose of merging with and into Grove Farm, would merge with and into Grove Farm with Grove Farm as the surviving corporation. Id. at 381 & n.4, 163 P.3d at 184 & n.4.

### (i)  Fraud

In their Opposition to the Motions to Dismiss, Appellants argued that Case and Attorney Appellees made "misleading statements to the [Grove Farm] [S]hareholders" that "Grove Farm was in severe risk of having to go into bankruptcy and greatly overstated the negative impact of such a bankruptcy." Appellants also maintained that Case and Attorney Appellees committed fraud by omission:

> The SAC [Second Amended Complaint] describes numerous omission [sic] by [Attorney Appellees].  They failed to correct misrepresentations by other Defendants and/or to disclose additional material facts, that would have completely changed the [S]hareholders['] outlook on the sale of Grove Farm.  [Appellants] relied to their detriment on the incorrect vision of the situation, created in part by [Attorney Appellees'] omission, when they entered into the unfavorable sale of Grove Farm.

(Footnote omitted.)  In support of this argument, Appellants cited to BMW of North America, Inc. v. Gore, in which the United States Supreme Court held that "actionable fraud requires a material misrepresentation or omission."  517 U.S. 559, 579 (1996) (emphasis in original omitted and emphasis added) (citing to Restatement (Second) of Torts § 538 (1977); W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 108 (5th ed. 1984)).

Count VIII of the Second Amended Complaint provides in pertinent part:

COUNT VIII<br>(Fraud -- All Defendants)

. . . .

343.  The Prospectus was materially misleading in that it contained material misinformation and omitted known information material to the decision being put to [S]hareholders . . . .  The supplemental proxy statement was likewise materially misleading and further failed to cure the materially false and misleading nature of the original Prospectus.

344.  Through their above-alleged written letters, reports, proxy statements, and meetings with the [S]hareholders, including [Appellants], [Attorney Appellees] and [Former Directors] provided factual information concerning the decision to sell and the ALPS [Merger] Agreement that they knew or should have known was materially false and/or misleading.  In other instances, [Attorney Appellees] and [Former Directors] omitted and/or failed to

21

provide information to the [S]hareholders in order to mislead them concerning the need to sell and the ALPS merger.

345. [Case] in particular had actual and legal control over and is responsible for the entire process outlined above, including but not limited to the flawed "auction" process run by his law firm, the contents of the CB&L-authored transactional documents and the contents of the Prospectus and supplemental proxy statement. He knew or should have known the "auction" process had been a sham and that Prospectus and other post-October 17, 2000 communications to Shareholders were materially false and misleading.

. . . .

348. Defendants made the foregoing material misstatements and withheld material information from the [S]hareholders with the intention to and for the purpose of misleading the necessary seventy-five percent (75%) supermajority of [S]hareholders to vote in favor of the ALPS [Merger] Agreement. They did so intentionally and for the purpose of inducing [S]hareholders, including [Appellants], to act. The Shareholders, including [Appellants], reasonably relied on Defendants' affirmative misstatements and Defendants' material omissions to their detriment in voting to sell to [Stephen], ALPS Investment and Acquisition Sub. As a direct and proximate result, [Appellants'] family company was sold unnecessarily and at a price far below its true value. [Appellants] were damaged in an amount to be proven at trial.

The elements of fraud are: 1) false representations made by the defendant, 2) with knowledge of their falsity (or without knowledge of their truth or falsity), 3) in contemplation of plaintiff's reliance upon them, and 4) plaintiff's detrimental reliance. Hawaii's Thousand Friends v. Anderson, 70 Haw. 276, 286, 768 P.2d 1293, 1301 (1989) (emphasis added). "Fraud is never presumed." Shoppe v. Gucci Am., Inc., 94 Hawai'i 368, 386, 14 P.3d 1049, 1067 (2000) (quoting TSA Int'l, Ltd. v. Shimizu Corp., 92 Hawai'i 243, 255, 990 P.2d 713, 725 (1999)). In their Second Amended Complaint and Opposition to the Motions to Dismiss, Appellants fail to adduce any evidence with respect to their reliance on the alleged fraud; hence, their claim that Case and Attorney Appellees fraudulently induced Appellants to sell their Grove Farm shares for less than fair market value fails as a matter of law.

(ii) Conspiracy to Defraud

The claim for conspiracy to defraud provides in relevant part:

COUNT XII
(Conspiracy to defraud [--] all defendants)
. . . .

359. CEO Klebahn, with the tacit approval of the other [Former Directors], conspired with [Case], [Attorney Appellees], and [Stephen], to defraud the [S]hareholders into believing that $152 per share was the highest price which could be attained in order to ensure that ALPS would be the purchaser of [Grove Farm] and that [CB&L] would continue to represent [Grove Farm].

360. The Attorney Defendants knew that they could ensure that [CB&L] continued to represent [Grove Farm] by ensuring that ALPS was the successful purchaser. [Attorney Appellees] also knew that they could ensure that ALPS was the successful purchaser if [CB&L] continued to represent [Grove Farm] and [Stephen], ALPS Investment and Acquisition Sub during the negotiations.

361. On or about September 22, 2000, [Case] and Klebahn agreed that [CB&L] would continue to represent [Grove Farm] in connection with [Former Directors'] attempt to sell all or substantially all of [Grove Farm's] shares.

362. Over the course of the following few weeks, the [Former Directors] and [Attorney Appellees], including [Case] as agent for [Stephen] and the two ALPS entities, developed a plan to defraud the [S]hareholders and ensure that ALPS was the successful purchasers [sic].

363. First, they agreed that [CB&L] would continue to represent [Grove Farm] even though Case was acting as his son's agent in the transaction. This would ensure that [Case and Stephen] remained privy to confidential information concerning ALPS' competitors.

364. Second, no formal restrictions of any kind were placed upon [Case's] ability to contact and discuss the transaction and any background information with his partners who were directly involved with [Grove Farm] and its efforts to find a merger partner. Case had access to confidential information in the possession of CB&L concerning [Grove Farm]. No other representatives or principles of other potential purchaser[s] were given similar access.

365. Third, it was agreed that [Cribley] and CEO Klebahn would provide the [Case and Stephen] with confidential and proprietary information concerning competing offers, the internal voting of the Board, and their "strike price." This information was not provided to other interested parties or their principals or agents.

366. Fourth, they agreed to inhibit and deter other interested parties from making competing and superior offers for the shares. In order to do so, [CB&L] was slow to produce materials and information to the other interested

23

parties. It also inserted onerous and unattractive terms and conditions not required of [Stephen], ALPS Investment or Acquisition Sub into responses to would-be competing bidders.

367. Fifth, they placed the ALPS' offer for fast-track Board approval. Although there were other serious parties whose interests in purchasing [Grove Farm] predated ALPS and who were supposedly then in active negotiation with [Grove Farm], [Grove Farm], through [Klebahn] with knowledge and participation of [CB&L] and [Former Directors], failed to provide the parties with an opportunity to meet or beat the ALPS offer prior to voting in favor of it at the October 17, 2000 board meeting.

368. Sixth, since they knew that the Wattson-Breevast offer of $170 per share under the same material terms and conditions as the ALPS Merger Agreement was a superior acquisition offer, they agreed that the Board would not further compromise [CB&L] by requesting a formal written legal opinion on that issue from CB&L or any other law firm.

369. Seventh, after additional questions continued to surface concerning the "Case" conflicts of interest, they agreed that the Board would at the eleventh hour and at great expense to [Grove Farm] retain another law firm to "give cover" to that charge.

370. When questions concerning the conflict of interest surfaced, Case and his law firm were obligated to either seek an advisory opinion concerning the conflict from the Office of Disciplinary Counsel or advise [Grove Farm] to obtain independent counsel solely to review the matter. They did neither.

371. As a result of their collective acts in furtherance of the conspiracy, ALPS became the successful purchaser of [Grove Farm] for far less than it was worth. CB&L continues to this day to represent [Grove Farm]. All of the [Former Directors] received the benefits of a six[-] year, tail-end E&O insurance policy covering their actions in connection with the ALPS Merger.

372. Several of the [Former Directors] additionally profited from the conspiracy[.]

373. As a result of [the] foregoing, [Appellants] have been damaged in an amount which will be proven at trial.

According to the Hawai'i Supreme Court, "the accepted definition of a [civil] conspiracy is a combination of two or more persons or entities by concerted action to accomplish a criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means." Robert's Hawai'i Sch. Bus, Inc. v. Laupahoehoe Transp. Co., 91 Hawai'i 224, 252 n.28, 982 P.2d 853, 881 n.28 (1999) (internal

quotation marks, citation, and brackets in original omitted). In Beck v. Prupis, 529 U.S. 494, 501-03 (2000), (footnote omitted) the United States Supreme Court stated:

> By . . . 1970, it was widely accepted that a plaintiff could bring suit for civil conspiracy only if he had been injured by an act that was itself tortious. See, e.g., 4 Restatement (Second) of Torts § 876, Comment b (1977) ("The mere common plan, design or even express agreement is not enough for liability in itself, and there must be acts of a tortious character in carrying it into execution"); W. Prosser, Law of Torts § 46, p. 293 (4th ed. 1971) ("It is only where means are employed, or purposes are accomplished, which are themselves tortious, that the conspirators who have not acted but have promoted the act will be held liable" (footnotes omitted)); Satin v. Satin, 69 A.D.2d 761, 762, 414 N.Y.S.2d 570 (1979) (Memorandum Decision) ("There is no tort of civil conspiracy in and of itself. There must first be pleaded specific wrongful acts which might constitute an independent tort"); Cohen v. Bowdoin, 288 A.2d 106, 110 (Me. 1972) ("'[C]onspiracy' fails as the basis for the imposition of civil liability absent the actual commission of some independently recognized tort; and when such separate tort has been committed, it is that tort, and not the fact of combination, which is the foundation of the civil liability); Earp v. Detroit, 16 Mich. App. 271, 275, 167 N.W.2d 841, 845 (1969) ("Recovery may be had from parties on the theory of concerted action as long as the elements of the separate and actionable tort are properly proved"); Mills v. Hansell, 378 F.2d 53 (C.A.5 1967) (per curiam) (affirming dismissal of conspiracy to defraud claim because no defendant committed an actionable tort); J. & C. Ornamental Iron Co. v. Watkins, 114 Ga. App. 688, 691, 152 S.E.2d 613, 615 (1966) ("[The plaintiff] must allege all the elements of a cause of action for the tort the same as would be required if there were no allegation of a conspiracy"); Lesperance v. North American Aviation, Inc., 217 Cal. App. 2d 336, 345, 31 Cal. Rptr. 873, 878 (1963) ("[C]onspiracy cannot be made the subject of a civil action unless something is done which without the conspiracy would give a right of action" (internal quotation marks omitted)); Middlesex Concrete Products & Excavating Corp. v. Carteret Indus. Assn., 37 N.J. 507, 516, 181 A.2d 774, 779 (1962) ("[A] conspiracy cannot be made the subject of a civil action unless something has been done which, absent the conspiracy, would give a right of action"); Chapman v. Pollock, 148 F. Supp. 769, 772 (W.D. Mo. 1957) (holding that a plaintiff who charged the defendants with "conspiring to perpetrate an unlawful purpose" could not recover because the defendants committed no unlawful act); Olmsted, Inc. v. Maryland Casualty Co., 218 Iowa 997, 998, 253 N.W. 804 (1934) ("[A] conspiracy cannot be the subject of a civil action unless something is done pursuant to it which, without the conspiracy, would give a right of action"); Adler v. Fenton, 65 U.S. 407, 24 How. 407, 410, 16 L. Ed. 696 (1860) ("[T]he act must be tortious, and there must be consequent damage").
>
> Consistent with this principle, it was sometimes said that a conspiracy claim was not an independent cause of action, but was only the mechanism for subjecting co-

conspirators to liability when one of their member committed a tortious act. *Royster v. Baker,* 365 S.W.2d 496, 499, 500 (Mo.1963) ("[A]n alleged conspiracy by or agreement between the defendants is not of itself actionable. Some wrongful act to the plaintiff's damage must have been done by one or more of the defendants, and the fact of a conspiracy merely bears on the liability of the various defendants as joint tort-feasors"). See *Halberstam v. Welch,* 705 F.2d 472, 479 (C.A.D.C. 1983) ("Since liability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort").

Because Appellants' fraud claim failed as a matter of law, their conspiracy to defraud claim must likewise fail.

### (5) Unjust Enrichment

The Second Amended Complaint provides in relevant part:

<u>COUNT XVIII</u>
(Unjust Enrichment – [Former Directors] and Attorney [Appellees])
. . . .

> 400. After unlawfully benefiting [sic] from the deal, [Stephen] handsomely rewarded those who aided him. Attorney [Appellees] and [Former Directors] were given numerous benefits and rights worth hundreds of thousands (or millions) of dollars, as alleged above.

> 401. These benefits constitute unjust enrichment of the [Former Directors] and Attorney [Appellees], as they arose out of and are traceable to their unlawful actions. Principles of equity dictate that they should not be allowed to keep these benefits.

In <u>Porter v. Hu</u>, 116 Hawai'i 42, 54-55, 169 P.3d 994, 1006-07 (App. 2007), this court described unjust enrichment as it is known in Hawai'i:

> The Hawai'i Supreme Court most recently addressed the subject in *Durette v. Aloha Plastic Recycling, Inc.,* 105 Hawai'i 490, 100 P.3d 60 (2004):

>> Unjust enrichment, as a claim for relief, is not clearly defined in either [HRS] or our jurisprudence. As far as we can tell, our best explanation of unjust enrichment has been as follows:

>>> It is a truism that "[a] person confers a benefit upon another if he gives to the other possession of or some other interest in money, land, chattels, or cho[]ses in action, . . . , or in any way adds to the other's security or advantage." *Restatement of Restitution* § 1 comment b (1937). One who receives a benefit is of course enriched, and he would be unjustly enriched if its retention would be unjust. *Id.* § 1 comment a. And it is axiomatic that "[a] person who has been unjustly enriched at the

26

> expense of another is required to make restitution to the other." *Id.* § 1. We realize unjust enrichment is a broad and imprecise term defying definition. But in deciding whether there should be restitution here, we are guided by the underlying conception of restitution, the prevention of injustice. *See* A. Denning, *The Changing Law* 65 (1953).

*Id.* at 502, 100 P.3d at 72 (footnotes and emphasis in original omitted) (quoting *Small v. Badenhop,* 67 Haw. 626, 635-36, 701 P.2d 647, 654 (1985)). A valid "claim for unjust enrichment requires only that a plaintiff prove that he or she conferred a benefit upon the opposing party and that the retention of that benefit would be unjust." *Durette,* 105 Hawai'i at 504, 100 P.3d at 74 (internal quotation marks, citation, and brackets omitted).

We find no authority for the notion that a claim of unjust enrichment requires a fiduciary relationship between parties to a transaction. Therefore, Appellants have standing to assert unjust enrichment against Attorney Appellees, and the circuit court erred by dismissing that claim. Nevertheless, the error was harmless because, as we have discussed, Appellants lacked standing to assert their breach of fiduciary duty claim, their negligence-based claims, and their constructive fraud and securities fraud claims, and they failed to state a claim upon which relief could be granted with regard to their participation in breach of fiduciary duty claim and their fraud and conspiracy to defraud claims.

### (6) Punitive Damages

Punitive damages are a remedy. See, e.g., Masaki v. Gen. Motors Corp., 71 Haw. 1, 6, 780 P.2d 566, 570 (1989) (holding that punitive damages "are awarded only when the egregious nature of the defendant's conduct makes such a remedy appropriate"). "[A] claim for punitive damages is . . . purely incidental to a separate cause of action." Ross v. Stouffer Hotel Co. (Hawai'i), Ltd., 76 Hawai'i 454, 466, 879 P.2d 1037, 1049 (1994). Hence, we need not address whether Appellants have standing to request punitive damages.

## 2. Costs

Appellants argue that the circuit court in <u>Tsukamoto</u> erred by awarding costs to Case and Former Directors. We have already addressed this point in <u>Tsukamoto</u>. 2009 WL 5117005, at *45-48.

## B. CROSS-APPEAL

Attorney Appellees argue that the circuit court erred by denying Attorney Appellees' Motion for Attorneys' Fees because Appellants requested attorneys' fees in the Second Amended Complaint and Appellants' allegations against Attorney Appellees derived from duties allegedly flowing from CB&L's contractual relationship with Grove Farm. Cribley, Lombardi, Tanaka, and CB&L brought the motion pursuant to HRS § 607-14 (Supp. 2008). That statute provides for attorneys' fees in actions in the nature of assumpsit:

> §607-14 Attorneys' fees in actions in the nature of assumpsit, etc. In all the courts, in all actions in the nature of assumpsit and in all actions on a promissory note or other contract in writing that provides for an attorney's fee, there shall be taxed as attorneys' fees, to be paid by the losing party and to be included in the sum for which execution may issue, a fee that the court determines to be reasonable; provided that the attorney representing the prevailing party shall submit to the court an affidavit stating the amount of time the attorney spent on the action and the amount of time the attorney is likely to spend to obtain a final written judgment, or, if the fee is not based on an hourly rate, the amount of the agreed upon fee. The court shall then tax attorneys' fees, which the court determines to be reasonable, to be paid by the losing party; provided that this amount shall not exceed twenty-five per cent of the judgment.

"Assumpsit is a common law form of action which allows for the recovery of damages for the non-performance of a contract, either express or implied, written or verbal, as well as quasi contractual obligations." <u>Schulz v. Honsador, Inc.</u>, 67 Haw. 433, 435, 690 P.2d 279, 281 (1984) (citation omitted), <u>overruled on other grounds by</u> <u>Blair v. Ing</u>, 96 Hawai'i 327, 331, 31 P.3d 184, 188 (2001) (<u>Blair II</u>). Whether an action is in assumpsit "is determined from the facts stated in, and the issues raised by, the plaintiff's complaint, declaration, or petition." <u>Schulz</u>, 67 Haw. at 436, 690 P.2d at 282 (quoting 63 Am. Jur. 2d

Products Liability § 906 (1984)). "Where there is doubt as to whether an action is in assumpsit or in tort, there is a presumption that the suit is in assumpsit." Blair II, 96 Hawai'i at 332, 31 P.3d at 189 (internal quotation marks and citation omitted). Further, "[w]hen there is doubt as to whether or not the plaintiff's complaint is in assumpsit or in tort, a plaintiff's prayer for attorneys' fees has been cited as a significant indication that the action sounded in assumpsit." Healy-Tibbits Constr. Co. v. Hawaiian Indep. Refinery, Inc., 673 F.2d 284, 286 (9th Cir. 1982).

In Attorney Appellees' Motion for Attorneys' Fees, Cribley, Lombardi, Tanaka, and CB&L cited to Blair II in support of their attorneys' fees request. In Blair I, Joan Hughes (Hughes) and her husband, Lloyd Hughes (Lloyd), were trustees of a revocable living trust agreement (Hughes Trust), of which their daughters (the plaintiffs) were the sole, named residual beneficiaries. Id. at 250-51, 21 P.3d at 455-56. When Lloyd died, Joan retained a certified public accountant (the CPA) to prepare the necessary federal and state estate tax forms. Id. at 251, 21 P.3d at 456. When Joan died, the plaintiffs became successor co-trustees of the Hughes Trust. Id.

In carrying out their duties as co-trustees, plaintiffs learned from various attorneys that the tax return prepared by the CPA contained several costly errors and omissions. Id. The plaintiffs filed claims against the CPA for professional malpractice and breach of implied contract, alleging that the CPA had breached his duty to them as intended third-party beneficiaries to the Hughes Trust. Id. The Circuit Court of the Second Circuit dismissed the claim against the CPA, finding that the requirements of negligent misrepresentation had not been met because the plaintiffs were merely incidental beneficiaries of the Hughes Trust. Id. at 252, 21 P.3d at 457. The plaintiffs appealed, id., and the Hawai'i Supreme Court upheld the Second

Circuit Court's ruling. <u>Id.</u> at 270, 21 P.3d at 475; <u>see also</u> <u>Blair II</u>, 96 Hawai'i at 328, 31 P.3d at 185.

After the Hawai'i Supreme Court filed its Notice and Judgment, the CPA timely filed a request for compensation for necessary expenses and attorneys' fees, pursuant to HRS § 607-14, which the supreme court granted in part and denied in part. <u>Blair II</u>, 96 Hawai'i at 328-29, 31 P.3d at 185-86. The supreme court held that the CPA was entitled to attorneys' fees because the breach of implied contract and negligence claims both arose out of the alleged implied contract between Joan and Lloyd. <u>Id.</u> at 332, 31 P.3d at 189. The supreme court stated that

> [w]ithout the implied contract, which could create a cognizable duty, [the plaintiffs] would have no negligence claim. Further, the damages alleged were more closely akin to contract damages than to tort damages because they were economic damages arising out of the alleged frustrated expectation that [the CPA] would take advantage of certain tax-saving devices. Thus, based on the complaint in this case, the essential character of the action against [the CPA] as "in the nature of assumpsit," as provided under HRS § 607-14.

<u>Id.</u> at 189-90, 31 P.3d at 332-33 (citations omitted).

<u>Blair II</u> is inapposite to this case because there, the plaintiffs pled breach of implied contract, whereas here, Appellants pled no breach of contract, either express or implied. Further, unlike the plaintiffs in <u>Blair II</u>, Appellants were not beneficiaries of any contract between Attorney Appellees and Grove Farm and, as we have discussed, Attorney Appellees had no duty to Appellants. Last, the damages Appellants requested in the Second Amended Complaint are more closely akin to tort damages, not economic damages arising out of any frustrated expectation on the part of Appellants.

Given the foregoing, the circuit court did not abuse its discretion by denying the Attorney Appellees' Motion for Attorneys' Fees.

## IV. CONCLUSION

The "Stipulation and Order for Entry of Final Judgment Pursuant to Rule 54(b) of the Hawaii Rules of Civil Procedure"

filed on September 11, 2007 in the Circuit Court of the Fifth Circuit is affirmed.

DATED:  Honolulu, Hawai'i, January 27, 2010.

On the briefs:

Damon M. Senaha
for Plaintiffs-Appellants/
Cross-Appellees.

George W. Playdon, Jr.
R. Aaron Creps
(Reinwald O'Connor &
  Playdon LLP)
for Defendants-Appellees/
Cross-Appellants.

Presiding Judge

Acting Associate Judge

Acting Associate Judge